[Crim. No. 2727. In Bank.—May 26, 1925.]

## THE PEOPLE, Respondent, v. ALFRED BOLLINGER, Appellant.

[1] CRIMINAL LAW—MURDER—EVIDENCE—CORPUS DELICTI—ADMISSIONS AND CONFESSIONS.—In a prosecution for murder, while the first point to which the evidence of the people should be directed is

1. Proof of *corpus delicti*, note, 68 L. R. A. 57, 73; 7 L. R. A. (N. S.) 181.

the *corpus delicti,* which should be established before introduction of evidence tending to connect the defendant with the offense, the rule does not go so far as to exclude, in showing the *corpus delicti,* proof of the defendant's connection with the crime, where the circumstances of the case are such that proof of the crime involves proof of defendant's guilt.

[2] ID.—ORDER OF PROOF—IRREGULARITY IN.—While proof of the *corpus delicti* should be made before the introduction of evidence of extrajudicial statements or admissions and confessions of the defendant in a prosecution for murder, in the absence of any showing of prejudice, irregularity in the order of proof is of no consequence, if the commission of the crime is ultimately established independently of the alleged admissions of the defendant.

[3] ID.—CHARACTER OF PROOF.—To authorize the reception and consideration by the jury of evidence of an extrajudicial confession or admission of the defendant, the people need not establish the *corpus delicti* by proof of the clear and convincing character required to support a conviction; but it is sufficient if there is some proof or *prima facie* proof, or even slight proof of the *corpus delicti.*

[4] ID.—SUFFICIENCY OF EVIDENCE.—In this prosecution for murder it is held that the evidence abundantly supports the verdict.

[5] ID.—SUFFICIENCY OF VERDICT.—In a prosecution for murder where the verdict finds the defendant guilty of murder in the first degree as charged in the indictment, it is sufficient although it is silent as to the punishment and it carries with it the death penalty.

[6] ID.—FORM OF VERDICT—INSTRUCTIONS.—In a prosecution for murder, an instruction that if the jury finds the defendant guilty of murder in the first degree it is at its discretion to fix his punishment as to whether he shall suffer death or confinement in the state's prison for life, and that if in the exercise of such discretion the jury thinks the defendant should suffer death it shall merely find him guilty of murder in the first degree, but if the jury fixes the punishment at confinement in the state's prison for life it shall so specify in the verdict, does not constitute an interference with the jury's exclusive discretion to fix the punishment.

[7] ID.—FIXING PENALTY—DISCRETION—INSTRUCTIONS.—In a prosecution for murder, an instruction in substance that if the jury should find the defendant guilty of murder in the first degree and that there is some extenuating circumstance in the case, it is within its discretion to relieve the defendant of the extreme penalty, but that its discretion in this regard is not an arbitrary one, and is to be

2.   See 8 Cal. Jur. 234; 13 Cal. Jur. 676.
3.   See 8 Cal. Jur. 235.
5.   See 13 Cal. Jur. 746.

employed only when it is satisfied that the lighter penalty should be imposed, and that if the evidence shows the defendant guilty of murder in the first degree, but does not show some extenuating circumstance it is the jury's duty to find a simple verdict of murder in the first degree and leave with the law the responsibility of affixing the punishment, does not constitute reversible error, although it is opposed to the provisions of section 190 of the Penal Code, vesting in the jury the discretion to impose the death sentence or life imprisonment in cases of murder in the first degree.

[8] ID.—BURDEN OF PROOF OF MITIGATION OR EXCUSE—SECTION 1105, PENAL CODE—INSTRUCTIONS.—In a prosecution for murder, the reading to the jury by the court in its instructions, of section 1105 of the Penal Code, which section provides that upon a trial for murder, the commission of the homicide by the defendant being proved, the burden of proving circumstances of mitigation, or that justify or excuse it, devolves upon him, unless the proof on the part of the prosecution tends to show that the crime committed only amounts to manslaughter, but that the defendant was justifiable or excusable, is not open to the objection that it assumes the commission of the homicide by the defendant has been proved and that it is an instruction upon a question of fact.

[9] ID. — BURDEN OF PROOF — INSTRUCTIONS. — In a prosecution for murder, there was no error in refusing an instruction "that in a murder case the burden is on the prosecution to establish the *corpus delicti* to a moral certainty and beyond a reasonable doubt," where the court gave several instructions upon the necessity of the prosecution proving the *corpus delicti* and that it must be established by direct or circumstantial evidence to a moral certainty and beyond a reasonable doubt, but could not be established by the extrajudicial admissions or confessions of the defendant.

---

(1) 30 C. J., p. 150, n. 8.   (2) 30 C. J., p. 150, n. 8.   (3) 30 C. J., p. 150, n. 12.   (4) 30 C. J., p. 312, n. 42.   (5) 30 C. J., p. 432, n. 72.   (6) 30 C. J., p. 425, n. 82.   (7) 30 C. J., p. 425, n. 87. (8) 16 C. J., p. 951, n. 7.   (9) 16 C. J., p. 1063, n. 85.

APPEAL from a judgment of the Superior Court of Yuba County and from an order denying a new trial.   Eugene P. McDaniel, Judge.   Affirmed.

The facts are stated in the opinion of the court.

Frank A. Duryea and Alvin Weis for Appellant.

---

8.   See 13 Cal. Jur. 735.

U. S. Webb, Attorney-General, J. Charles Jones, Deputy Attorney-General, and Ray Manwell, District Attorney, for Respondent.

LAWLOR, J.—The defendant was charged by indictment with the crime of murder. He pleaded not guilty to the indictment, was tried on the charge, and found guilty of murder in the first degree, the verdict carrying the death penalty. In due course a motion for a new trial was interposed by defendant and denied, whereupon judgment of death was pronounced upon him. The appeal is from said judgment sentencing him to death and from the order denying defendant's motion for a new trial.

The evidence introduced at the trial tends to show that on May 27, 1924, C. J. McCoy, sheriff of Yuba County, was informed, by an itinerant laborer, named Dan McVey, that a dead man was lying in a body of water called Nigger Jack or Simmerley Slough situated near the cemetery north of Marysville; that said sheriff notified the county coroner; that the coroner repaired to said slough and found the dead body lying face downward, partly submerged; that a superficial examination at the time showed the deceased had been subjected to great violence—the skull was crushed in and several ribs broken; that decomposition had set in; that in the month of April, 1924, appellant and his wife were camping or stopping at an auto camp in Yolo County, across the river from Sacramento; that a man well along in years and known thereabouts only as "Alex" was also stopping at said auto camp at the same time; that appellant and his wife struck up an acquaintance with "Alex"; that when "Alex" first came to the auto camp he had with him a horse and rig together with a supply of camping utensils; that while there he purchased or acquired another horse and rig; that subsequently, and about April 15, 1924, appellant, his wife, and "Alex" left the auto camp together—appellant, accompanied by his wife, driving one horse and rig and "Alex" the other; that upon their departure from said auto camp they proceeded along the road leading from Sacramento to Marysville; that twenty-five or thirty days later appellant and his wife were seen by C. Z. Berry driving along the Twelfth Street road toward Sacramento; that

on this occasion appellant and his wife were each driving a horse and rig; that about June 15, 1924, appellant and his wife were at the city of Napa; that during their stay there appellant sold to Joseph A. Marshall a sorrel horse, a spring wagon, and harness; to C. D. Butler, a brown mare, harness, and wagon—the latter containing wearing apparel, a yellow cat, and three pigeons; and to Louis Pasquini, the camping utensils, tents, tables, and everything of that sort. These purchasers testified at the trial and described the property as above set forth.

Subsequent to the coroner's discovery of the body in the slough appellant was arrested and made a confession in which he told of the killing of "Alex" with an ax, stating therein that deceased had previously threatened his life. The confession assumed to set forth the movements of the trio following their departure from the camp grounds.

2 and 3. We will consider first appellant's second and third claims of reversible error, for if those contentions have merit it would not be necessary to consider the other points made on appeal. The second and third claims of reversible error are thus stated:

"2. The ruling of the trial court holding that the prosecution had sufficiently proven the *corpus delicti* to admit proof of the so-called confession, statement, or admission of the defendant is reversible error."

"3. The denial of defendant's motion for an instructed verdict is reversible error . . . what we have said under previous headings of this brief and the cases cited under citation of error Number 2 apply here. . . ."

We will now set forth the substance of the evidence which had been received before the asserted confession was admitted.

Frank Bevan, coroner of Yuba County, testified that on the evening of May 27, 1924, he found the body of a dead man in the waters of Nigger Jack or Simmerley Slough; that the face was in the water as was the front part of the body; that the body was in a nude condition with the exception that it had on a part of an undershirt and a torn and tattered blue denim working shirt; that he removed the body from the water, made a casual examination, and placed it in the receiving vault; that such casual examination as was made at that time revealed that the body had

been immersed in water, "that the skull evidently was entirely caved in on the top"; that on the morning of June 4th a more thorough examination was made and an autopsy performed by Dr. Allen Gray—the witness and his assistant, Mr. Buchanan, being present; that this examination showed the body to be in the condition revealed by the prior examination except that it was in an advanced stage of decomposition and the odor had become more pronounced; that it also showed the left eye and nose to be broken and decomposed, as were the lips; that the height of the deceased was estimated at about five feet, six inches, and his age between fifty and sixty years; that the bones of the upper and lower jaw revealed no signs of teeth; that the sheriff, the district attorney and himself visited the slough on the morning of the 26th of June, 1924, and the sheriff then recovered from the bushes or trees certain bedding and a pillow which the witness identified on the stand as the bedding then found by the sheriff.

Doctor Allen E. Gray testified that on the morning of June 4, 1924, he was called to the Marysville cemetery to and that he did perform an autopsy; that there were present at that time the coroner and his assistant; that the autopsy disclosed the body of a man about five feet, six inches in height and apparently past fifty years of age; that the body was badly decomposed and parts of the skin and flesh were missing; that the top of the scalp, a part of the skull itself and the brain were missing; that the top of the skull was badly fractured and the fracture ran down toward the left orbit and the nose; that the eyes were missing and the flesh decomposed; the same being true of the skin and flesh of the nose; that there were no teeth and no signs of their recent removal; that there was a fracture of the third, fourth, and fifth rib on the left side and that there was a bandage on one finger; that there were no other bones broken or other marks of violence; that, in his opinion, "death came from a blow on the man's head"; that the man evidently had been dead three or four weeks or longer. On cross-examination he stated he could not say positively that these injuries were received before death; on redirect examination he declared that deceased did not have the appearance of a man that had been drowned.

C. C. Berry testified that during the month of April, 1924, he was running the camp ground in Sacramento and had seen appellant and his wife there as campers; that they left the grounds about the 15th of April of that same year in company with an old man who also had been staying there and was known to him only as "Alex"; that "Alex" was about five feet, six and one-half or seven inches tall and probably aged sixty-five years; that he thought "Alex" had no teeth; that "Alex" had stopped at the camp ground about a month and a half; that when he came he had a brown mare and a light buckboard rig; that during his ("Alex's") stay there he purchased another light one-horse rig and a sorrel mare; that appellant, his wife and "Alex" came to the camp grounds about the same time and before leaving together they told him they were going to Knights Landing to go to work; that as they left appellant was driving one rig and "Alex" the other; that each had a camping outfit—two separate tents—while there, which they took along when they left; that he recognized a "grub box" shown him as being one that belonged to "Alex"; that after they left he never again saw any of them.

C. Z. Berry testified that in the month of April, 1924, he worked in the grocery store in the camp grounds conducted by his brother, the preceding witness, at Sacramento; that he was acquainted with appellant, his wife, and "Alex"; that "Alex" was about sixty years of age, weighing 140 or 145 pounds and probably five feet, six inches in height; that he never saw any teeth in his mouth; that "Alex" had with him while at said camp grounds a brown mare and a sorrel or chestnut; that the last time he ever saw "Alex" was about the 20th of April, 1924; that he also saw appellant at about the same time at the camp grounds; that he saw appellant and his wife about twenty-five or thirty days later on the Twelfth Street road going toward Sacramento; that each was driving a horse and wagon, the appellant being in the lead; that the horses "resembled the horses the old gentleman had"; that they appeared to have a camping outfit with them. On cross-examination he declared "Alex" had no teeth in front as he saw none while talking with him in the store; that it was impossible to positively recognize the horses appellant and wife had with them on the last occasion on which he saw them as the

horses that belonged to "Alex" but that they "looked the
same color of horses."

Louis Pasquini testified that June 15, 1924, he saw appellant and his wife for the first time across the road from
his blacksmith-shop, one block north of the city limits of
Napa; that they had with them at the time "two horses
and two rigs, two complete single rigs, spring wagons and
camping utensils"; that on the following day appellant
came to him and wanted to sell out everything he had, including two horses which he described as "One was a bay
and the other a sorrel"; that appellant told him his wife
was sick and he therefore desired to sell out everything
he had so that he might take his wife to Oakland and to a
hospital; that at that time he purchased from him "The
cooking utensils and the camping utensils, tents, tables,
everything of that sort; cooking utensils, camping outfit,
tents, tables, and so forth"; that he (the witness) had no
use for the horses and rigs and therefore declined to purchase them; that he recognized two axes, a table, tent, box,
bucket, and mattress shown him, as being part of the outfit
he bought from appellant.

Joseph A. Marshall testified that he saw appellant on the
16th of June, 1924, across the street from Pasquini's blacksmith-shop; that at this time he bought a sorrel horse, spring
wagon, and harness from him.

C. D. Butler testified that he saw appellant in the city of
Napa June 16, 1924, and that upon this occasion he purchased from him (appellant) a brown mare, harness, and
wagon.

The coroner, being recalled, testified that the body he
recovered from the slough did not have the appearance of
one that had been drowned; that he was at the slough again
on June 26, 1924, when C. J. McCoy, sheriff of Yuba
County, recovered a bed; that the bed, shown him, was the
bed found by the sheriff upon that occasion; that said bed
was in the sheriff's office later when the appellant, the
district attorney, the sheriff, and himself were present;
that upon said occasion, so far as he was aware, no threats
or inducements were made to appellant; that the sheriff
asked appellant, "Is that the old man's bed or bedding?"
that he hesitated a few seconds and finally answered "Yes."

Sheriff McCoy, of Yuba County, testified that he saw appellant for the first time in Sacramento on June 25, 1924, and that since that time he had been in the custody of his office; that the first talk he had with appellant was in an automobile coming from his residence to the county jail in Sacramento and then at the county jail in said city in the presence of Deputy Sheriff Robbins and the district attorney; that the next conversation with him was in the home of Joseph E. Pipher in Sacramento on the evening of the same day; that the next in chronological order was on the 26th of June and the next on the 8th of July; that, so far as he was aware, no other officers had any conversations with appellant in his absence; that he, nor anyone to his knowledge, did not, upon any of these occasions, hold out any threats, promises, rewards, or inducements to the appellant; that upon the occasion of the conversation in the home of Joseph E. Pipher no threats or promises were made to the appellant and that the statements there made by appellant were freely and voluntarily made by him; that said conversation took place about 8 P. M. on the evening of June 25, 1924, and there were present Deputy Sheriffs Robbins and Wilcoxson; appellant, Joseph E. Pipher, district attorney, and himself; that, upon this occasion, the district attorney asked appellant "if he would be willing to have his statement taken down in shorthand by a reporter"; that he said "Yes"; that he was then taken to Joseph E. Pipher's house and the district attorney questioned him.

Joseph E. Pipher testified that he was a shorthand reporter of the Sacramento superior court; that on the twenty-fifth day of June, 1924, he saw appellant at his (Pipher's) house; that there were present at this time the district attorney, the sheriff, Deputies Wilcoxson and Robbins, the appellant, and himself; that they gathered about 7:10 o'clock in the evening; that no threats were made or promises held out to appellant and that his statement was freely and voluntarily made.

The rule requiring proof of the *corpus delicti* before the admission of extrajudicial confessions is thus stated in 8 Cal. Jur., page 234, section 303:

[1] "Proof of *Corpus Delicti* and of Admissions and Confessions.—Logically, the first point to which the evidence

of the people should be directed is the *corpus delicti*. This should be established before the introduction of evidence tending to connect the defendant with the offense. The rule, however, does not go so far as to exclude, in showing the *corpus delicti*, proof of the defendant's connection with the crime, where the circumstances of the case are such that proof of the crime involves proof of defendant's guilt.

[2] *"Admissions or confessions.*—Proof of the *corpus delicti* should be made before the introduction of evidence of extrajudicial statements or admissions, and confessions. But in the absence of any showing of prejudice, irregularity in the order of proof is of no consequence, if the commission of the crime is ultimately established independently of the alleged admissions of the defendant.

[3] "To authorize the reception and consideration by the jury of evidence of an extrajudicial confession or admission of a defendant, the people need not establish the *corpus delicti* by proof of the clear and convincing character required to support a conviction. It is sufficient if there is some proof, or *prima facie* proof, or even slight proof of the *corpus delicti*. The uncorroborated testimony of a witness is sufficient to establish the *corpus delicti* for this purpose, even when the statute requires corroboration before a conviction can be had. Indeed, the confession of the defendant will furnish sufficient corroboration. But proof by hearsay testimony is insufficient. Since the criminal agency of the defendant is not an element of the *corpus delicti*, it is not necessary that the evidence of the *corpus delicti* should itself connect or tend to connect the defendant with its perpetration in order to make evidence of the confession admissible."

Applying this rule, we think that the trial court in denying the motion to advise the jury to acquit on this ground correctly summarized the evidence and disposed of the legal question involved. We quote: "The motion is denied, the *corpus delicti* was sufficiently proven before any testimony of any statement of the defendant was introduced. The law as to that is very clear; the body was found, the man was dead; the body exhibited external marks of violence, skull crushed in, the brains gone, evidently the body of a man who had been dead some time; decomposition had set in. The doctor expressed the opinion that the cause of death was

the injury to the skull and head which was necessarily fatal. There was no evidence of any drowning or poison or any other mode of death; it was very apparent from the description of the wounds that they could not have been self inflicted; the man was evidently killed by somebody. Here is a man with marks of fatal wounds on his body; he is dead; his body is found; there you have evidence of the *corpus delicti* unless it is apparent the wound may have been self inflicted, and this was impossible from the description of the wounds, so he was killed by some agency. The evidence does not show there was any agency that could have done that except some blow from some external force, and the nature of the wound and evidence of the physical surroundings would indicate a crime had been committed and not suicide. Then there was independent evidence showing that a man answering very accurately the description of the body found by the coroner was seen in company with the defendant and his wife in Sacramento, that they left there together; that the dead man had been the owner of two traveling rigs, horses and wagons, and that they left at the same time, the deceased in one rig and the defendant and his wife in another. They stated they were going to Knights Landing on one road between Marysville and Sacramento. That afterwards the defendant and his wife were seen at Sacramento in these rigs, and that the defendant sold a lot of camping utensils, in Napa, and the horses and wagons. I think there was sufficient proof of the *corpus delicti* the moment Doctor Gray testified. There is most abundant proof of the agency, then all this proof of the people being seen to leave Sacramento together, the disappearance of the third party and the disposition of the property by the defendant, and on top of that we have the clear cut confession of the defendant as to the manner in which he dealt the death blow to the deceased. It would be the height of absurdity to give the jury any such direction. The motion is denied.''

It is apparent from the foregoing that the evidence of the voluntariness of the confession was ample. The evidence having been held to be sufficient to justify the admission of the extrajudicial confession, we will now set forth the substance thereof: That he had been married a little over a year; that on April 24, 1924, or the latter part of April,

he and his wife were camped in the Berry camp grounds outside of Sacramento; that at that time "Alex" was also camped there; that they had been camped there "about two weeks, I think it was—not over three, at the most"; that they just had a tent and camp outfit; that they bought a horse and buggy from "Alex"; that "Alex" then bought another horse and rig; that he became acquainted with "Alex" through bandaging his sore arm on several occasions; that he thought "Alex" was between fifty-five and sixty years of age; that after "Alex" bought that second rig the trio started toward Marysville; that he and his wife rode in the rig said to have been purchased from "Alex"; that "Alex" kept right behind them in the other rig; that they were on the road three nights before reaching Marysville; that they reached Marysville and camped near the cemetery; that he had worked in the District Ten country before—that is, about three years previously; that they pulled off of the road that goes down to the left near "Nigger Slough"; that he and his wife "went to bed powerful early"; that "Alex" went to bed about seventy-five feet from where they were; that he woke up about daylight; that he hit "Alex" on the top of the head with an ax lying near the latter's bed; that "Alex" was attired only in his union suit and work shirt; that he then took him down to the slough and "drug him out in the water there a little ways"; that it could not have been over seventy-five yards distant from the public road where he left "Alex" in the slough; that he then returned and removed from "Alex's" clothes a $100 bill and two $5 bills; that he and his wife came back to Sacramento. "Did you say anything to your wife, or tell her to get up, or pack up, or anything? A. Why, she wanted to pack up and come on back. . . . Q. And did she ask you any questions about what became of the old man? A. Well, she asked me what I had done. Q. She didn't see you do this, did she? A. No"; that he sold "Alex's" outfit at Napa for $15; that at his wife's suggestion he threw "Alex's" personal belongings in the Sacramento River off the Natomas boulevard; that when they got to Sacramento with the money he had gotten, he purchased a suit of clothes; that "Alex's" hair was getting tolerable gray but he could not say whether or not he was baldheaded or had any teeth but thought he was smooth shaved; that he would judge "Alex" was about

five-ten in height and weighed about 140 pounds; that "Alex" on three different occasions made threats against him—"My wife told me of one occasion, and then I heard two other— two other occasions"; that the reason he did not sever his connections with him was because he "owed him a little bit on the outfit—besides he wanted to stay right with us all the time"; and that certain inconsistent statements as to where they separated from "Alex" and the road taken were made because "my conscience brought the words out; that was all."

Appellant did not appear as a witness on the trial. His wife, Eva Bollinger, testified, however, that the man who was with them ("Alex") on the trip from Sacramento in April, 1924, told her that he would "get" her husband yet; that she told her husband of his threat out by the cemetery near Marysville. On cross-examination she admitted that he made these threats because "he thought my husband neglected me and had me working, that is, the words he spoke about my husband"; and, that, in a conversation with the sheriff, she stated there was "no truth" in her husband's statement that the old man had made threats against him at two named places, adding " . . . but my husband was very jealous of the old man, but I told my husband if I was going to have anything to do with a man I wouldn't have anything to do with an old man, but I would pick a young man." It is proper to state in this connection that the jury was at the request of appellant elaborately charged on the subject of self-defense or justifiable homicide within the meaning of sections 197 and 198 of the Penal Code and the decisions thereunder, although the only evidence bearing on said question was that given by Eva Bollinger, as above stated, and the extrajudicial declarations of appellant.

As we read appellant's brief it is not claimed that the evidence presented on the trial is insufficient to sustain the verdict. But in the statement of the grounds on appeal (sec. 1247, Pen. Code) it is declared:

"(3) That the verdict is against law.

"(4) That the verdict is contrary to the evidence."

[4] Touching these contentions, and assuming they are before us, it is sufficient to point out that the evidence we have summarized abundantly supports the verdict rendered

and we fail to find in the record that such evidence was in any real sense controverted.

[5]   1. In the first assignment of error it is contended that the judgment is void for the reason that the jury in its verdict failed to fix the penalty as provided in section 190 of the Penal ·Code.   The verdict rendered reads as follows: "We, the jury in the above-entitled cause, find the defendant, Alfred Bollinger, guilty of murder of the first degree as charged in the indictment."

Section 190 of the Penal Code reads: "Every person guilty of murder in the first degree shall suffer death, or confinement in the state prison for life, at the discretion of the jury trying the same. . . . "   It is true the jury alone shall determine in a case of murder in the first degree whether the punishment shall be death or confinement in the state prison for life and that the jury after exercising such discretion shall by its verdict, either by its terms or when read in the light of the instructions, plainly indicate the punishment fixed.   It is clear that the verdict in this case, considered in the light of the following instruction, calls for the death penalty and that the judgment is not void because of the failure of the verdict to specify therein, in terms, the punishment to be inflicted.   The instruction reads: "If you find the defendant guilty of murder in the first degree it is at your discretion to fix his ·punishment; that is to say, whether the defendant shall suffer death or confinement in the state prison for life.   If, in the exercise . of such discretion, you think the defendant should suffer death, *you will merely find him guilty of murder in the first degree;* but if on the other hand you fix his punishment at confinement in the state prison for life, you will specify the same in your verdict."   (Italics added.)   In conformity with the said instruction the jury, having determined on the extreme penalty, simply brought in a verdict of guilty of murder in the first degree without specifying in terms the punishment to be inflicted.   This follows the instruction for it indicated that if the death penalty was determined upon the punishment should not ·be specified in the verdict; the only reference to be made to the punishment in the verdict was in the event the jury resolved on life imprisonment—"but if on the other hand you fix his punishment in the state prison for life, *you will specify the same in*

*your verdict."* The silence of the verdict as to the punishment must, therefore, in the light of the instruction, be taken as the equivalent of a finding that appellant shall suffer the death penalty. (*People* v. *Perry et al.,* 195 Cal. 623, [234 Pac. 890].)

[6]   4. Having shown that the verdict is sufficient, we will next consider appellant's fourth assignment of error that the quoted instruction itself was erroneous in that it constituted an interference by the court with the discretion exclusively reposed in the jury to fix the punishment to be inflicted in murder of the first degree.   We do not perceive in said instruction any attempt to interfere with the exercise of the discretion of the jury in fixing the punishment in the event they should find appellant guilty of murder in the first degree.   The instruction is hypothetical in form—"If you find the defendant guilty of murder in the first degree" —and it then proceeds to instruct the jury as to the form of verdict to be rendered if the death penalty is determined upon, and the form of verdict if it is resolved to prescribe life imprisonment.   It is clearly an instruction as to *how* the punishment determined by the jury shall be expressed— not *what* the punishment shall be.   It is not necessary, therefore, to pursue the contention further or to consider the authorities cited by appellant, for in addition to this instruction being free from criticism, the instructions reviewed in those authorities assumed to direct the jury as to how the discretion in the matter of punishment should be exercised.

5. Appellant's next contention is thus stated:

[7]   "The giving of the following instruction was reversible error, to-wit:

" 'If the jury in this case should find the defendant guilty of murder in the first degree and they also shall find the further fact that there is some extenuating fact or circumstance in the case, it is within their discretion to pronounce such a sentence as will relieve the defendant from the extreme penalty of the law.   The jury in a criminal case for murder is vested with a discretion but the discretion is not an arbitrary one, and is limited to determining which of two punishments shall be inflicted, and is to be employed only when the jury is satisfied that the lighter penalty should be imposed.   If the evidence shows the defendant to be

guilty of murder in the first degree but does not show some extenuating fact or circumstance, it is the duty of the jury to find a simple verdict of murder in the first degree, and leave with the law the responsibility of affixing the punishment.' "

It is contended that the instruction is erroneous "for the reasons and under the authorities cited and discussed under the heading 'Error 1' in this brief and we think it is unnecessary to further discuss that phase of the case." The authorities referred to are *Winston* v. *United States*, *Strather* v. *United States*, and *Smith* v. *United States*, 172 U. S. 303 [43 L. Ed. 456, 19 Sup. Ct. Rep. 212; see, also, Rose's U. S. Notes]. These cases involved the act of Congress of January 15, 1897, chapter 29, 29 Stats. at Large, 487, which reads in part: "In all cases where the accused is found guilty of the crime of murder . . . the jury may qualify their verdict by adding thereto 'without capital punishment'; and whenever the jury shall return a verdict qualified as aforesaid the person convicted shall be sentenced to imprisonment at hard labor for life." The juries in those cases were instructed in effect that their discretion was not an arbitrary one and that the qualification should be added to the verdict only in those cases showing palliating or mitigating circumstances. In condemning the instructions and reversing the judgments, the court said:

"The right to qualify a verdict of guilty, by adding the words 'without capital punishment,' is thus conferred upon the jury in all cases of murder. The act does not itself prescribe, nor authorize the court to prescribe, any rule defining or circumscribing the exercise of this right; but commits the whole matter of its exercise to the judgment and the consciences of the jury. The authority of the jury to decide that the accused shall not be punished capitally is not limited to cases in which the court, or the jury, is of opinion that there are palliating or mitigating circumstances. But it extends to every case in which, upon a view of the whole evidence, the jury is of opinion that it would not be just or wise to impose capital punishment. . . .

"The instructions of the judge to the jury, in each of the three cases now before this court, clearly gave the jury to understand that the act of Congress did not intend or authorize the jury to qualify their verdict by the addition

of the words 'without capital punishment,' unless mitigating
or palliating circumstances were proved.

"This court is of opinion that these instructions were erro-
neous in matter of law, as undertaking to control the dis-
cretionary power vested by Congress in the jury, and as at-
tributing to Congress an intention unwarranted either by
the express words or by the apparent purpose of the
statute; . . . "

We have already quoted the pertinent part of section 190
of the Penal Code. Before the amendment of that section
in 1873–74 (Stats. 1873–74, p. 457) it read as follows:
"Every person guilty of murder in the first degree shall
suffer death. . . . " It is clear beyond question that by
the language of the amended section—"Every person guilty
of murder in the first degree shall suffer death, or confine-
ment in the state prison for life, at the discretion of the jury
trying the same; . . . "—two changes were made in the law
as to the punishment for murder in the first degree—first,
that the punishment may be *either* death or life imprison-
ment; and, second, that the discretion of determining which
punishment shall be imposed was vested in the jury alone.
For, as declared in the above federal cases, the law places
no restriction upon the jury's exercise of such discretion,
nor does it attempt to confine its exercise to cases presenting
palliating or mitigating circumstances. In our opinion, the
trial court should never instruct the jury as to how the dis-
cretion should be exercised. The legislature has "confided
the power to affix the punishment within these two alterna-
tives to the absolute discretion of the jury. . . . " (*People*
v. *Leary*, 105 Cal. 486, 496 [39 Pac. 24].) The question
is not a new one in this state and while in no instance has
it been held that the giving of such an instruction is er-
roneous under the decisions, yet no case has declared that
such an instruction comes within the meaning of section 190
of the Penal Code.

In *People* v. *Bawden*, 90 Cal. 195 [27 Pac. 204], which
involved three instructions whose import is almost identical
with the one now under discussion, this court said:

"If the question here presented were a new one, there
would be strong reasons for holding that by section 190
of the Penal Code the legislature intended to give to the
jury the entire power of fixing the punishment in such a

case, uninfluenced by the court; and that there is no warrant in the code for any distinction, in this regard, between one kind of murder in the first degree and another. But these instructions are literal copies of instructions given and approved by this court in *People* v. *Brick,* 68 Cal. 190 [8 Pac. 858]. The same rule was also substantially stated in *People* v. *Jones,* 63 Cal. 168, and in *People* v. *Murback,* 64 Cal. 369 [30 Pac. 608], the language of the instructions approved was almost identical with that used by the court in the case at bar, although it may be said that in the Murback case the opinion of the court was hardly in consonance with the instructions approved. The same rule seems to have been approved in *People* v. *Olsen,* 80 Cal. 128 [22 Pac. 125].

"Similar instructions have no doubt been given in other cases now on their way here by appeal; for it is to be observed that whenever a doubtful instruction has been approved by this court, it has generally been seized upon and injected into future cases. Great confusion would therefore occur if we should enter into a new examination of this question, and should come to a conclusion opposite to that heretofore reached. Moreover, as was said by the court, on another subject, in *People* v. *Myers,* 20 Cal. 520, 'we do not think this question has practically so much importance as is sometimes attributed to it'; for a juror, exercising the responsibility of choosing between the imprisonment of a defendant and his death, will act upon his own discretion, and not upon that of another. Therefore we decline to reopen the question, and hold that the instructions, under the authorities, were not erroneous. It is to be hoped, however, that trial courts will not make further excursions into this doubtful domain."

Notwithstanding this concluding suggestion the court has been called upon to consider the question in the following cases: *People* v. *Leary, supra; People* v. *Rogers,* 163 Cal. 476, 483 [126 Pac. 143] ; *People* v. *Wolfgang,* 192 Cal. 754, 761 [221 Pac. 907] ; *People* v. *Casade,* 194 Cal. 679 [230 Pac. 9] ; *People* v. *Craig,* 69 Cal. Dec. 431, 436 [235 Pac. 721] ; *People* v. *Perry et al.,* 195 Cal. 623 [234 Pac. 890].

While we are satisfied that the giving of such instructions is opposed to the provisions of section 190 of the Penal Code, we are not prepared to depart from the decisions on

this point. In other words, we consider as settled that the giving of such instructions is not error. We have, however, gone into the subject in the hope, if not the expectation, that the practice of giving such instructions may be abated, thus giving assurance that the penalty reflects the decision of the jury alone and at the same time sparing this court the necessity of repeatedly passing on such assignments of error. And considering the numerous occasions this court has held that section 190 of the Penal Code confers on the jury alone the discretion of determining the punishment in cases of guilt of murder in the first degree, trial courts, especially where a human life is at stake, should not interfere with the discharge of that solemn duty by the jury.

[8] 6. The next contention is that the court committed error in reading to the jury section 1105 of the Penal Code, which provides: "Upon a trial for murder, the commission of the homicide by the defendant being proved, the burden of proving circumstances of mitigation, or that justify or excuse it, devolves upon him, unless the proof on the part of the prosecution tends to show that the crime committed only amounts to manslaughter, or that the defendant was justifiable or excusable." It is contended that "This instruction assumes that the commission of the homicide by the defendant has been proved. It is equivalent to instructing the jury that such proof has been made. It is an instruction upon a question of fact. The jury, under such instruction, were told by the court that the question of fact, to-wit, whether or not the homicide had been committed by the defendant, had been proved and that they were no longer to consider that question as in doubt. . . . This same instruction was given in the case of *People* v. *Tapia*, 131 Cal. 647 [63 Pac. 1001], and was there held by this court to be prejudicial error."

The giving of the instruction was doubtless prompted by appellant's claim that the deceased told Mrs. Bollinger he would "get" her husband and that she repeated the threat to appellant, at the cemetery near Marysville. Appellant's objection is similar to that made in *People* v. *Grill*, 151 Cal. 592, 595 [91 Pac. 515, 516], and what was said in that case completely disposes of the contention. We quote:

"The court in its instructions read to the jury section 1105 of the Penal Code. . . . The phrase objected to was not

inserted in the instruction as a statement by the court that the commission of the homicide by the defendant had been proved. It was meant as an expression of a condition or event, upon which the succeeding part of the instruction would become applicable, and that is its true rhetorical meaning when considered in connection with the text. Its signification is the same as if the sentence began thus, 'When, upon a trial for a murder, the commission of the homicide by the defendant has been proved,' etc. Thus understood, it does not constitute a statement of the fact by the court. In *People* v. *Tapia,* 131 Cal. 647 [91 Pac. 515, 516], this instruction was given with some additions declaring the extent of the burden of proof cast upon the defendant. It was criticised in that case upon the ground that the jury might have understood the above-quoted phrase as a declaration that the fact referred to had been proved. The defendant in that case did not attempt to mitigate, justify or excuse the homicide, but denied that he had committed the act. Consequently, it was said, 'the instruction should not have been given, for it was entirely inapplicable.' . . .

"In the present case the instruction could not have been so understood by the jury. Other instructions repeated frequently the proposition that the jury were the exclusive judges of the facts. . . . In view of these instructions it would be impossible for any jury of ordinary intelligence to have supposed that the instruction complained of was intended to state to them that the fact that the defendant had committed the homicide had been proven."

[9] 7. Under this assignment of error it is asserted that the court erred in refusing an instruction "that in a murder case the burden is on the prosecution to establish the *corpus delicti* to a moral certainty and beyond a reasonable doubt." It appears that the court gave several instructions upon the necessity of the prosecution proving the *corpus delicti,* and though none of them expressly stated the measure of proof required of the prosecution to prove that element of the crime, the court, after defining the term "*corpus delicti,*" its essential ingredients, and declaring that the burden was on the prosecution to establish it, gave the following instruction:

"The *corpus delicti* may be established by direct or circumstantial evidence. But it cannot be established by the

extrajudicial admissions or confessions of the defendant, or, as the rule is frequently expressed, a conviction cannot be had on the extra-judicial admissions or confessions of the defendant unless corroborated by proof, outside of such admissions or confessions, of the *corpus delicti*. It is a rule of evidence that admissions or confessions of a party are never sufficient to convict unless and until the *corpus delicti* is proved. After proof of the *corpus delicti*, then, and then only, admissions or confessions, if any have been established by the evidence to a moral certainty and beyond a reasonable doubt, may be used by the jury in determining whether or not the defendant is guilty as charged in the indictment.''

From this and the instructions given to the jury on ''reasonable doubt'' and kindred subjects, we think the jury was instructed that the *corpus delicti* as well as every other essential of the offense must be established to a moral certainty and beyond a reasonable doubt.

8. Appellant's final specification of error is thus stated: ''For the reasons given under the previous assignments and the cases there cited, we think it was error for the court to refuse defendant a new trial.''

In view of the disposition we have made of the preceding points it must be held that this contention is without merit.

The judgment and order denying appellant's motion for a new trial are affirmed.

Shenk, J., Richards, J., Seawell, J., Lennon J., and Waste, J., concurred.