[Crim. No. 3897. In Bank.—April 1, 1936.]

THE PEOPLE, Respondent, v. LOUIS N. GOSDEN, Appellant.

Melvin M. Belli for Appellant.

U. S. Webb, Attorney-General, Seibert L. Sefton, Deputy Attorney-General, Earl Warren, District Attorney, Charles D. Wehr, Assistant District Attorney, and Warren Olney III, Deputy District Attorney, for Respondent.

CURTIS, J.—The appellant by the verdict of a jury was found guilty of murder in the first degree without recommendation for leniency and was by the court adjudged to suffer the death penalty. From this judgment and also from the order denying a new trial, he has appealed.

The indictment against the appellant charged him with the murder of Laura Gosden on the twentieth day of November, 1934. Laura Gosden at the time of her death was the wife of appellant. They were married October 7, 1930, about

four years before the death of the wife, and at the time of her death they with their daughter Joyce, born during the first year of their marriage, were living in the city of Oakland. No accusation was made against the appellant charging him with his wife's death until over three months thereafter, when the indictment in this case was presented on the fifth day of March, 1935, charging him with being criminally responsible for her death. On February 26th, just prior to the filing of the indictment, the wife's body was exhumed and examination of the contents of her stomach was made, and the autopsy physician, Dr. Gertrude Moore, making said examination, reported the presence of traces of strychnine in the stomach of the deceased wife. At the trial of the action it was further shown that appellant on September 27, 1934, had purchased strychnine from a local drug store under the assumed name of L. N. Larsen. The appellant at the time of the purchase gave a fictitious address to the druggist. The druggist's register showed that the purpose of his purchase of the poison was to "kill a kitty". At the time of his arrest appellant first denied the purchase of the strychnine, but later admitted that he purchased the same for the purpose of killing rats at his father's home at Sunnyvale. He testified at the trial that he used the strychnine to exterminate rats at his father's home, but that he did not tell either his father or mother at the time that he was attempting to exterminate rats on their place by the use of poison. The father and mother, however, testified that the rats at their place disappeared about the time the appellant stated that he had put out the poison for the purpose of killing them. A short time after appellant's arrest a small bottle, corresponding in size and shape with the bottle in which the druggist sold the strychnine to appellant, and in which there had been strychnine, was found under appellant's house. Appellant testified that his wife knew of his purchase of the poison and had access to it after its purchase up to the time of her death. According to his testimony, on the day of her death she was in usual health but became ill about 7 o'clock in the evening. She went into the bathroom and would not let him come in. At about 10:30 o'clock she said she was getting worse. Appellant suggested that he get a doctor but she would not let him. A little later in the evening the appellant went for a doctor but returned without one, stating that the stores were

all closed at that hour of the night. The Gosdens had no telephone in their home and evidently appellant wished to have it appear that he endeavored to find a telephone at some of the near-by stores to be used in telephoning for a doctor. A Mrs. Gonsalves, who lived next door to the Gosdens and whose home was just across the driveway from that of the Gosdens, testified that she went into her bathroom at about 11 o'clock the night Mrs. Gosden died. The window of her bathroom faced the window of the Gosdens' kitchen. From her window she saw appellant and his wife in the kitchen. She could hear indistinctly their conversation. After appellant returned from his unsuccessful search for a doctor, which was about 11 o'clock, Mrs. Gonsalves heard Mrs. Gosden tell her husband to go across the street to the Cereghinos and phone for a doctor. Again she told him to hurry and get a doctor. The appellant left the house, but instead of going for a doctor stood outside under the kitchen window listening to the groans and cries of his wife. He walked back and forth in the shadow of the house, but in plain view of Mrs. Gonsalves, for about an hour. During this time he made no effort to get a doctor, although he could hear his wife's crying and her statements that she was dying. Finally the wife, about 1 o'clock, called for Mrs. Gonsalves and the latter, in response to the call, went over to the Gosden home. Immediately on hearing this the appellant went into his house and said to his wife: "What did you want to bother that woman for?" and his wife replied that she had to have somebody. The appellant then left the house and went across the street to the Cereghinos and told Mr. Cereghino to telephone for a doctor. In response to Mr. Cereghino's call his family doctor, Dr. Ream, arrived at the Gosdens' house in about ten minutes. Dr. Ream found Mrs. Gosden on the kitchen floor. He remained with her until the time of her death, which occurred about one-half hour after his arrival. The evidence before us indicates that the death of Mrs. Gosden was due to strychnine poisoning.

As a motive that appellant murdered his wife the following state of facts was shown: Appellant was a plumber by trade. He had made a fair living at his trade until a few months before the death of his wife. As a result of being out of employment his financial resources were at a low ebb. When he lost his position in August, 1934, his bank account had been

reduced to slightly over $50. Notwithstanding the condition of his finances at that time he took out two policies of insurance on September 5, and one on September 8, 1934, paying therefor in premiums the sum of $19.75. These policies were all upon the life of the wife, with appellant as the beneficiary. Two of these policies were payable in case of accidental death, and the other, as we understand from the evidence, was payable in the event of death due to natural causes. Two other policies of insurance were also taken out at the same time upon the life of appellant with his wife as beneficiary. There is some uncertainty in the evidence as to whether Mrs. Gosden knew, or at least realized, that any of these policies was issued upon her life, or that she signed all three, or any, of the applications for said policies. This question is not of any material importance, as we view this case. The fact remains that appellant either with or without the knowledge of his wife procured policies of insurance upon her life payable to himself as beneficiary, and these were secured only a short time before the death of his wife. On the day of his wife's death the appellant called on an undertaking company and ordered a $500 funeral for his wife, offering as evidence of his ability to pay the cost of the funeral first one and then the other of the two accident policies, which were rejected by the undertaker for the reason that the policies were payable only in case of accidental death, and the death certificate showed death was due to pneumonia and not to accident. It was suggested that an autopsy be performed to show that death was due to ptomaine poisoning as contended by appellant, but upon discovery that death by poisoning was not covered by the policy that idea was abandoned.

On the day his wife died the appellant procured Lydia Sanborn, a girl about 17 years of age, ostensibly to take care of his daughter, Joyce. He first called for Lydia Sanborn at 7 o'clock in the morning, and not finding her at home, went again later in the day to the place where she was living and arranged for her to come to his home and care for his young daughter. The inference is quite strong that appellant was on at least friendly terms with Lydia Sanborn before the death of his wife. Lydia Sanborn went with appellant and lived at his home and at other places, taking care of his young daughter and performing other domestic duties. The appellant admits that he had sexual intercourse with her within a

week after his wife's death. They lived together thereafter apparently as man and wife until Lydia, who was only 17 years of age, was taken into custody by the juvenile authorities and the appellant was charged with contributing to her delinquency.

The evidence also disclosed the fact that the appellant had been married prior to his marriage with Laura Gosden. His first marriage was in 1927 to a girl 17 years of age named Vivian Taylor. On January 16, 1928, Vivian died suddenly under circumstances that strongly indicated that her death was due to strychnine poisoning. Appellant a week prior to her death had procured a policy of insurance upon Vivian's life payable to himself as beneficiary. He attempted to collect the amount called for by this policy after her death, but was informed that he could not do so, as there had been no medical examination of Vivian as required by the policy.

There were also admitted in evidence two prior unsuccessful attempts by appellant to take out policies of life insurance upon the life of his mother with himself as beneficiary. These attempts to insure his mother's life were made after the death of Vivian and before the death of Laura Gosden. Both failed for the reason that the appellant gave a fictitious address for his mother in his application for such insurance. The evidence indicates that the mother had no knowledge of the making of either of these applications for insurance upon her own life.

Among the grounds for reversal of the judgment assigned by appellant is that the evidence is not sufficient to justify his conviction. We will first discuss this ground before taking up the assignments which relate to purely questions of law, for the reason that a clear understanding of all these facts in the case will better enable us to decide whether the trial court correctly applied the law to the factual situation presented to him by the evidence in this case.

In stating the facts set forth above we have followed to a large extent the evidence produced by the prosecution. This evidence is not entirely uncontradicted. On the other hand, the appellant has entered a more or less vigorous denial to many of the statements made by the witnesses on behalf of the prosecution. These conflicts in the evidence have been by the jury resolved in favor of the respondent, and under these circumstances this court cannot disturb the jury's determina-

tion if supported by any substantial evidence. As this case involves the life of the appellant we feel that some discussion should be made of those facts and circumstances which he relies upon to overcome the evidence of the prosecution.

Appellant admits his former marriage with Vivian Taylor and that she died about six months after their marriage. He claims she was not poisoned but died of double pneumonia, as was shown by the death certificate issued by the attending physician. This same physician testified at appellant's present trial and admitted that he issued a death certificate in which he stated that the cause of Vivian Gosden's death was double pneumonia, but that after learning more of the facts and circumstances surrounding her death was of the opinion that he was in error in issuing said death certificate, and that he was of the opinion that Vivian Gosden's death was caused by strychnine poisoning. While appellant admits he procured life insurance on the life of his wife Vivian about a week before her death, he claims that his wife knew of such insurance and consented to the same being issued upon her life. As we view the action of the appellant at that time, the fact which weighs against him is not that he surreptitiously procured insurance upon his wife's life but that he had in fact insured her life with himself as the beneficiary just prior to her death, and that upon the very day of her death, which was apparently from the effects of strychnine poisoning, he took steps to collect this insurance. These facts would tend to show a motive on appellant's part for taking his wife Vivian's life. Appellant makes the claim that when he insured his wife Laura's life, she was fully cognizant of that fact, and that appellant at the same time insured his own life making his wife beneficiary under the policy. Conceding appellant's claim in this respect to be true, and there is substantial evidence to support it, yet the fact stands out that appellant at the time of the death of his wife Laura had insurance on her life which he endeavored to collect immediately upon her death. Appellant testified at the trial that he purchased strychnine from a neighboring drug store about one month prior to his second wife's death and that the purchase was made under the assumed name of Larsen. He claims that his wife knew of the purchase and that he purchased the poison under an assumed name at her request in order, so he says she stated, that they might not get into any

trouble regarding the purchase of the poison. While this was the testimony of the appellant given at the trial, immediately after or about the time of his arrest, in a statement made to the district attorney, he denied purchasing any strychnine at or about the time of his wife's death under the assumed name of Larsen, or under his own or any other name. It clearly appears that it was not until he was confronted with the absolute proof of such purchase and the finding of the empty bottle under his home that he admitted that he bought the strychnine and gave as a reason for purchasing it the extermination of rats on the parents' place at Sunnyvale. There can be no criticism of the implied finding of the jury that the appellant purchased the strychnine for an ulterior purpose. The story told by the appellant of events transpiring during the evening immediately preceding his wife's death differed materially from that set forth herein in the statement of facts. Appellant admits that his wife took violently ill about 7 o'clock in the evening; that he wanted to go for a doctor, but that she refused to permit him to do so; that he remained with her until around 11 o'clock, when he went out in search of a doctor and endeavored to find a telephone in some of the stores near by; that most of these were closed and in one of them not closed he was informed that there was none in that particular store. He produced at the trial a proprietor of a store in the neighborhood who testified that some man inquired for a telephone at his store at about the time the appellant stated he was out searching for a doctor, but this witness could not identify the appellant as the man who made the inquiry. Appellant, so he testified, then went back to his wife and eventually went out across the street to Mr. Cereghino and had him telephone for a doctor. Appellant denied that he spent an hour or any time at all walking between his house and that of Mrs. Gonsalves, as testified to by Mrs. Gonsalves. This statement of the appellant, particularly that in which he denies that he spent an hour along about midnight just outside of his house and between his house and that of Mrs. Gonsalves, is directly contradicted by the testimony of Mrs. Gonsalves, and his failure to call a doctor for his wife until almost 1 o'clock, and then only after his wife had called to Mrs. Gonsalves. It is not satisfactorily explained by anything contained in his evidence concerning his actions on that evening. One of the first statements made by the doctor

called to attend his wife was to censure the appellant for his failure to call him earlier in the evening. In behalf of the appellant there was evidence introduced both by himself and other witnesses that his wife Laura was despondent for some months prior to her death and threatened to take her own life. In January just prior to her death she had undergone an operation in which she had both breasts removed. She complained that by reason of the operation she was not only disfigured but that she would be unable to nurse a baby again in case one was born to her. There is evidence that she was then pregnant, or thought she was, and was taking pills to relieve her condition. As a result she expressed herself, so some of the witnesses testified, as having tired of life and being more than willing to die. This evidence is not uncontradicted. On the other hand it was shown in rebuttal that his wife was not despondent over her condition; that her breasts were normal in size and shape and that she was not in a pregnant condition. The ultimate determination of the weight of this evidence, both for and against appellant, was with the jury and we cannot say that it failed in its duty by disbelieving, as apparently it did, the story of appellant and his witnesses. Upon the facts before the jury as shown by the record it cannot be reasonably claimed that the verdict is not supported by sufficient and substantial evidence.

█ Turning now to the questions of law raised by appellant, the first contention made is that the trial court erred in admitting evidence of the death of appellant's former wife, Vivian Taylor Gosden. It is not necessary to repeat the evidence to show the similarity of the circumstances surrounding the deaths of appellant's two wives. This evidence tended to show that each died of strychnine poisoning, each was insured with the appellant as the beneficiary, and in each case the appellant attempted immediately upon the death of the wife to collect the insurance upon her life. The evidence as to the death of the first wife and the fact that her life was insured with the appellant as beneficiary was properly admitted to show the motive of appellant in the murder of his second wife. (*People* v. *Northcott*, 209 Cal. 639, 652 [289 Pac. 634, 70 A. L. R. 806].) █ It was also admissible to show knowledge on the part of the appellant as to the effect of administering strychnine to a human being. The fact that he was fully cognizant at the time of the circumstances surround-

ing the death of his first wife from the effects of strychnine administered to her tended to show that he had a knowledge of the symptoms and fatal effects of strychnine poisoning, and with his knowledge he made no attempt to procure a doctor to relieve his second wife until the administered poison had brought her to the brink of death. In support of the admissibility of this evidence we would cite the following excerpt from the opinion in *People* v. *Morani,* 196 Cal. 154, 159 [236 Pac. 135, 137] : "The evidence was therefore relevant for the purpose of showing knowledge as an element of criminal intent. In view of this case the remoteness in point of time of the previous offense is of no material consequence. If the defendant acquired such knowledge under the circumstances here shown in evidence it is not at all likely that he had forgotten it in the interim. Where the evidence of another offense is admissible and relevant for the purpose of showing knowledge as an essential element of criminal intent, the remoteness in point of time of such other offense may go to the weight but not to its admissibility." Appellant contends that in this case the remoteness in point of time of the death of his first wife, which was almost seven years before the death of his second wife, renders the evidence of the previous crime inadmissible in the present action. As stated by the language just quoted, the remoteness of the first offense only goes to the weight and not to the relevancy of its evidence. The evidence shows that the appellant, if not present at the death of his wife Vivian, knew that she died in convulsions of the most distressing and harrowing nature, evidently the result of strychnine poisoning. It is not probable that he had forgotten the scene surrounding her death, although seven years intervened between that event and the death of his second wife.

 Appellant also assigns as error the admission in evidence of his relations with Lydia Sanborn immediately after the death of his wife Laura. In the case of *People* v. *Smith,* 55 Cal. App. 324, 335 [203 Pac. 816], the court declared that "No rule is more firmly established than that, upon the trial for murder of husband or wife, evidence tending to show illicit relations of the accused with another is admissible to show lack of love and affection for the defendant's lawful spouse". While in that case the evidence showed that the illicit relations occurred prior to the time the accused was alleged to have murdered his wife, we see no reason why the same rule should

not apply where the evidence showed that the illicit relations took place immediately after the crime was committed. In *Pierson* v. *People,* 79 N. Y. 424, 435 [35 Am. Rep. 524], evidence was held competent as showing motive which showed that the defendant on trial for the death of the husband was married to the wife of the deceased within one week after the husband's death. In the case before us appellant was acquainted with Lydia Sanborn during the lifetime of his wife Laura. Just how intimate this acquaintance with her was does not clearly appear. But he admits that when he first had improper relations with her, only a week after his wife's death, he was interested in her to such an extent that at least in his own mind he contemplated making her his wife. It may reasonably be inferred from this admission that his interest in Lydia Sanborn antedated the death of his wife Laura. This evidence not only showed lack of love and affection for his wife, Laura, and therefore he was not unwilling to see her die, but it showed a motive for him to put her away that he might marry another.

At the conclusion of the argument of this case before the jury the trial court, as a part of his instructions to the jury, made certain comments on the evidence in pursuance of the authority conferred upon trial courts by the recent constitutional amendments (sec. 13 of art. I and sec. 19 of art. VI).

The attorney-general raises the objection that appellant is foreclosed from taking exception to the comments of the court upon the evidence for the reason that he failed to object to the court's comments at the time they were made or at any time during the trial of said action. As stated before, the comments of the court, which the appellant claims trespassed upon his legal rights, were made just before the case was submitted to the jury and as a part of his instructions to the jury. By section 647 of the Code of Civil Procedure, the giving of an instruction, although no objection to the instruction was made, is deemed to have been excepted to. Section 19 of article VI as now in force reads in part as follows: "The court may instruct the jury regarding the law applicable to the facts in the case, and may make such comment on the evidence and the testimony and credibility of any witness as in his opinion is necessary for the proper determination of the case." Evidently this section of the Constitu-

tion contemplated that comments on the evidence might be given by the trial judge in the same manner and as a part of the instructions in the case. When so given it is not necessary for the party whom they may affect adversely to object to them. They then come within the terms of said section 647 of the Code of Civil Procedure and are deemed to have been excepted to. As the comments of the trial judge in this case were given along with and as a part of the instructions to the jury, the appellant is not precluded from taking advantage of any errors, if any were made, contained therein by his failure to object to them at the trial of the action. The case of *People* v. *Bishop,* 134 Cal. 682, 685, 686 [66 Pac. 976], and other California cases cited in respondent's brief and relied upon in support of the claim that appellant, by failure to except to the court's charge, is precluded from raising any objection to the comments of the court contained in the instructions to the jury, are not in point, as for instance in the Bishop case, on appeal the acts of the court which were claimed to be erroneous were made during the progress of the trial, without objection by the party complaining and without any exception having been made thereto.

█ Appellant's first criticism of the court's comment is that the trial judge went outside the record, singling out individual witnesses and expressing an opinion as to their interest. We find no instance wherein the trial court to any appreciable extent went outside of the record in commenting upon the testimony of any witness. The right of the court to single out any individual witness in commenting upon his testimony seems to be expressly given by the Constitution which, as we have seen, provides that the court may make such comment on the evidence and the testimony and credibility of any witness as in his opinion is necessary for the proper determination of the case. It is true there are decisions of this court, rendered prior to the adoption of said amendment, and in other jurisdictions, which hold that the court may not single out an individual witness and direct its instructions to the witness mentioned. But if we are to give full effect to the Constitution as it now is in force and which expressly gives the court the power to comment upon the testimony of "any witness", we must hold that a new rule of procedure has been engrafted onto the jurisprudence of this state which permits the court to single out an individual

28

witness and comment upon his testimony, which power the court did not possess prior to the recent amendment to the Constitution.

■ The trial court in the exercise of its recently acquired power called attention to the evidence of the appellant in signing his wife's name to an application for insurance and stated that the innocent purpose of the appellant in so doing had "not to my mind been satisfactorily explained". The court further referred to the purchase of strychnine by appellant and stated that appellant's explanation of that purchase did not "appeal to my mind as reasonably consistent with an honest mind". The court also referred to the testimony of appellant's mother regarding the knowledge of Laura Gosden as to insurance on her life and stated that the testimony of the mother "may be viewed in the light of the witness' interest in the case". Appellant contends that these comments were beyond the court's powers in that they expressed an opinion as to the interest of these witnesses in the result of the case on trial. In the case of *Reagan* v. *United States*, 157 U. S. 301, 310 [15 Sup. Ct. 610, 39 L. Ed. 709], we find the rule upon this subject aptly expressed. After referring to the fact that it was beyond the power of the court to even indirectly instruct the jury to disbelieve the defendant simply because he was the defendant, the court goes on to say: "On the other hand, the court may and sometimes ought, to remind the jury that interest creates a motive for false testimony; that the greater the interest the stronger is the temptation; and that the interest of the defendant in the result of the trial is of a character possessed by no other witness, and is therefore a matter which may seriously affect the credence that shall be given his testimony." Under this rule as announced by the Supreme Court of the United States the comments of the trial court regarding the testimony of the appellant and that of the mother and as to their interest in the case were well within the power given him by the Constitution.

■ Appellant also complains of the comments of the court in regard to the evidence of certain witnesses of the prosecution where the trial judge states that "I see no reason for disbelieving them". This criticism is squarely answered by the provisions of said section of the Constitution which give to the trial judge the power to comment upon the "credibility of any witness".

■ It is further contended by appellant that the power to comment upon the evidence gives the court no right to express an opinion upon the guilt of the accused. We have carefully examined the comments of the court as set forth in the record of the case and find no instance wherein it either directly or indirectly expressed its opinion that the appellant was guilty. It is true in the court's comment it questioned appellant's innocent purpose in signing his wife's name to the applications for insurance, and further commented upon appellant's explanation of his purpose in purchasing strychnine, but in neither instance did the court express any opinion as to appellant's guilt or innocence of the charge against him. It was the right of the court to make such comment upon the testimony and credibility of the appellant as in its opinion was necessary for the proper determination of the case, and when it questioned appellant's explanation of his purpose in signing his wife's name to the applications for insurance and of his purchase of the strychnine it did no more than comment upon the credibility of appellant as a witness. Appellant relies upon the case of *United States* v. *Murdock*, 290 U. S. 389 [54 Sup. Ct. 223, 78 L. Ed. 381], where the court held that the trial court erred in giving an instruction reading in part as follows: "The court feels, from the evidence in this case, that the government has sustained the burden cast upon it by law, and has proven that the defendant is guilty in manner and form as charged, beyond a reasonable doubt." The comment of the court in that case was so radically different from anything found in the comment of the trial court in the instant case as to render the federal case of slight value for our present purpose. Comments like those given by the trial court as last referred to were not improper as expressions of opinion as to the guilt of the appellant. (*Egan* v. *United States*, 22 Fed. (2d) 776, 778.)

■ It is next contended that the court in its comments upon the evidence related only the evidence in behalf of the prosecution and made no reference to that offered in favor of the accused. In reading the court's comment we find that in considering the various questions presented by the evidence the court set forth, in practically if not in every instance, the evidence offered by each side of the controversy. The first question the court considers is whether Laura Gosden

died from the effects of strychnine poison. In its comments upon this question the court calls attention to the medical testimony both for and against the accused, as to the cause of Laura Gosden's death, and then gives its opinion as to the weight of this evidence. In the same manner the court discusses the questions as to whether the strychnine.was administered by appellant or was taken by Laura Gosden herself with suicidal intent, as claimed by the appellant, by reason of the fact that she was despondent since the operation upon her breasts and as shown by entries in her diary and the testimony of the appellant and other witnesses. In the same manner the court discusses appellant's explanation as to his purpose in purchasing the strychnine, the testimony of Mrs. Gonsalves, the relations of appellant and Lydia Sanborn, the taking out of insurance upon the life of his wife Laura with himself as beneficiary, and circumstances surrounding the death of appellant's first wife Vivian after he had, or thought he had, insured her life in his favor. Upon all of these questions and, in fact, upon all matters commented upon by the court we think adequate consideration was given to the testimony in behalf of the appellant, as well as that against him.

As a final objection to the comments of the court, appellant takes exception to the following statement appearing therein: "In the event of your finding the defendant guilty of murder in the first degree you should consider all the evidence to determine whether any circumstances or reasons exist for the exercise of your discretion in relieving the defendant from the extreme penalty. I have been unable to find any." We will first discuss this comment without the last sentence. While instructions containing statements similar to the comment of the court just quoted (with the last sentence thereof eliminated) have been frequently criticized, in no instance has this court held that it was reversible error to give such an instruction. (*People* v. *Bollinger*, 196 Cal. 191 [237 Pac. 25].) The exclusive right of the jury in a criminal case to fix the punishment of a defendant found guilty of murder in the first degree either at life imprisonment or by death, is not an arbitrary right to be exercised by it without reference to or independent of the evidence in the case. (*People* v. *Reid*, 193 Cal. 491, 496 [225 Pac. 859]; *People* v. *Wolfgang*, 192 Cal. 754, 762 [221 Pac. 907].) In each of these two cases an instruction containing the follow-

ing provisions was sustained: ''If the evidence shows beyond all reasonable doubt the defendant to be guilty of murder in the first degree but does not show some extenuating fact or circumstance, it is the duty of the jury to find a simple verdict of murder, and leave with the law the responsibility of fixing the punishment.'' These authorities not only justify the comment of the court now under discussion, but the only reasonable conclusion to be drawn from that language is that the jury in exercising its discretion in fixing the punishment in a case of murder in the first degree is to be governed by a consideration of the evidence in the case. 

This brings us, then, to the consideration of the comment of the court above quoted including the last sentence, which reads, ''I have not been able to find any.'' In other words, the court told the jury that it had not been able to find in the evidence that any circumstance or reason existed for the exercising of the jury's discretion in relieving the appellant of the extreme penalty. This was purely a comment on the evidence in the case and was justified under the authority given the court by the constitutional amendment to make such comments on the evidence as in its opinion are necessary for the proper determination of the case. Appellant does not contend that the comment of the court that ''I have not been able to find any'' is not justified by the evidence in the case, nor does he indicate any evidence which might have been considered by the jury in the exercise of its discretion in fixing the punishment at life imprisonment rather than at death, if it found him guilty of murder in the first degree beyond a reasonable doubt. The comment complained of finds express support in the case of *Commonwealth* v. *Nafus,* 303 Pa. 418 [154 Atl. 485], where an instruction much more inimical to the interest of the defendant than that in the present case was approved, the court holding that, ''It may be suggested that trial judges should be very careful in expressing an opinion as to the penalty. It should not be done except in an atrocious case such as this, and then it should be well guarded. However, it is not reversible error to express an opinion as to the punishment to be fixed, as long as the jury is left free to act regardless of that opinion.'' Similar views were expressed by the Supreme Court in the later cases of *Commonwealth* v. *Stabinsky,* 313 Pa. 231 [169 Atl. 439], and *Commonwealth* v. *Edwards,* 318 Pa. 1 [178 Atl. 20]. The statute of

Pennsylvania, giving the jury the right to fix the punishment in cases of murder in the first degree is practically the same as section 190 of the Penal Code of this state.

The comment of the trial judge in the instant case, on the whole, was fair, temperate and impartial. It briefly covered the salient points of the case and the evidence of each side bearing upon the several questions presented for the jury's determination. While the conclusions drawn were not favorable to the appellant in most instances, they were practically the only conclusions that could legitimately be drawn from the evidence. The statement of the court at its very beginning contained an admonition that the jury were the sole judges of all questions of fact and the credibility of the witnesses; that they were not to consider any comment of the court as binding upon them or necessarily to be followed by them; that the court did not intend or desire that the judgment of the court should be substituted for that of the jury; and that their verdict should reflect their sound judgment and not that of the court. The court reiterated in substance these admonitions at the close of his statement and again impressed upon the jury that they should consider themselves not bound or influenced against their own judgment, by any comment of the court. The trial court, in our opinion, discharged its full duty in the giving of these admonitions, and did not by its comments transgress the legal limits of the law, fixed by the present Constitution of this state, as expounded by the courts of those jurisdictions where similar laws have prevailed before the same was incorporated into the judicial procedure of our state.

As we find no reversible error in the record, we are of the opinion that the judgment should be affirmed and it is so ordered. The order denying motion for a new trial is affirmed.

Langdon, J., Thompson, J., Waste, C. J., Seawell, J., Shenk, J., and Conrey, J., concurred.