[Crim. No. 2569. In Bank.—December 28, 1923.]

THE PEOPLE, Respondent, v. ISAAC WOLFGANG, Appellant.

[1] CRIMINAL LAW — MURDER OF POLICEMEN — SELF-DEFENSE — INSTRUCTIONS.—In a prosecution for the murder of a policeman, the modification of a requested instruction, that "You are instructed that even though the defendant was subject to arrest by the officer he nevertheless had a right to protect himself from any unwarranted attack if any made upon him by the officer, and if the officer suddenly hit the defendant with a blackjack, the defendant had a right to take any course necessary to protect his own life or to defend himself from great bodily injury," so as to read, "Even though the defendant was subject to arrest by the officer he nevertheless had a right to protect himself from any unwarranted attack if any made upon him by the officer," was not prejudicial in view of other instructions given by the trial court and requested by the defendant covering the subject of self-defense.

[2] ID.—SELF-DEFENSE—INSTRUCTIONS.—In such prosecution, in view of all the instructions given, the trial court did not err in instructing the jury that if from the evidence it believed "beyond all reasonable doubt, that, without any overt act or physical demonstration upon the part of the deceased sufficient to warrant the

defendant, as a reasonable man, in believing that he was in great bodily danger, he, the defendant, fired the fatal shot at deceased and killed him, such killing under such circumstances was not justifiable."

[3] ID.—EVIDENCE—INNOCENCE OF DEFENDANT — REASONABLE DOUBT— INSTRUCTIONS.—While instructions given by the trial court, that the defendant in a criminal action is presumed to be innocent until he is proved to be guilty, and that in case of a reasonable doubt whether his guilt is satisfactorily shown he is entitled to an acquittal, and defining reasonable doubt and stating that the burden of proof is upon the prosecution, do not repeat and elaborate upon the subject as fully or as comprehensively as those requested by the defendant, they concisely cover the points stated, and were sufficient.

[4] ID.—FLIGHT OF DEFENDANT—KNOWLEDGE—INSTRUCTIONS.—In such a prosecution, the giving of an instruction dealing with the flight of the defendant which omitted the qualification that the defendant at the time of his flight, knew he was charged with the murder of the police officer, will not warrant a reversal of the judgment unless it appears that the defendant has been prejudiced thereby; and no such prejudice appears in this case.

[5] ID.—FIXING OF PUNISHMENT—DISCRETION OF JURY—INSTRUCTIONS. In such a prosecution, the right of the jury to exercise the discretion in fixing punishment given by section 190 of the Penal Code, which provides that "Every person guilty of murder in the first degree shall suffer death, or confinement in the state prison for life, at the discretion of the jury trying the same," was not invaded by instructions given by the trial court.

[6] ID.—REQUESTED INSTRUCTIONS COVERED BY GIVEN INSTRUCTIONS— ABSENCE OF ERROR.—In such prosecution, the defendant cannot justly complain that the trial court erred in refusing to give certain instructions to the effect that mere probabilities are not sufficient to warrant a conviction, nor is it sufficient, upon the doctrine of chances, that it is more probable that the defendant is guilty, and also that the defendant was not compelled to prove himself innocent, where in given instructions the trial court repeated in almost exact words parts of the requested instructions, and gave all of them in effect.

[7] ID.—INSTRUCTIONS.—Trial courts are not required to repeat over and over again instructions couched in varying language but embodying the same principle of law.

[8] ID. — AUTHORITY TO ARREST DEFENDANT — REFUSAL TO GIVE REQUESTED INSTRUCTIONS — CORRECTNESS OF RULING. — In such a prosecution, the ruling of the trial court refusing to give instructions requested by defendant relating to the authority of the deceased policeman to arrest defendant, and under what circum-

stances arrests are illegal, was proper where, assuming, without deciding, that the policeman may not have had actual authority, as defined by the code, to arrest defendant without a warrant (Pen. Code, sec. 836), a night watchman, who summoned the policeman and in whose presence the offense was committed, did have such authority, either as a special police officer—provided he was one—or as a private citizen, and also had authority to summon the policeman to aid him in apprehending the defendant, if he deemed it necessary; and it was not necessary to inform the defendant of the intention to arrest him, for he was pursued and apprehended immediately after the commission of the offense.

[9] ID.—THEORY OF DEFENSE—INSTRUCTIONS.—In such a prosecution, the ruling of the trial court refusing to give instructions requested by defendant relating to the authority of the deceased policeman to arrest defendant was correct for the further reason that the killing of the policeman by defendant occurred after the arrest and while in actual custody of the policeman, and defendant, in justification of his act, relied upon a plea of self-defense against injury or death, the jury being fully instructed as to his rights in that theory of the case.

APPEAL from a judgment of the Superior Court of Los Angeles County and from an order denying a new trial. Paul J. McCormick, Judge. Affirmed.

The facts are stated in the opinion of the court.

W. T. Aggeler and F. H. Vercoe for Appellant.

U. S. Webb, Attorney-General, and John W. Maltman and Erwin W. Widney, Deputy Attorneys-General, for Respondent.

WASTE, J.—The defendant was charged with the murder of Oliver Vernon Densmore, a regular patrolman of the police department of the city of Los Angeles. He was convicted of murder in the first degree and sentenced to suffer the death penalty. From the judgment of the court and its order denying his motion for a new trial he prosecutes this appeal. He admits that the evidence is sufficient to sustain the verdict of the jury, but relies for a reversal upon alleged errors of the trial court in the giving and refusing of certain instructions, which errors, he claims, vitally prejudiced his substantial rights.

In order that the contentions of the appellant may be the better understood, it is necessary to state the material facts found in the record. The defendant, fifty-four years of age, and unmarried, resided alone at a rooming-house in the city of Los Angeles. According to the testimony of A. H. Rude, a special watchman, at half-past 4 o'clock on the morning of November 24, 1922, defendant was seen to take two bottles of milk from a box in front of a building on the latter's beat. Rude called upon the defendant to halt, but he turned around and ran. He was followed by the special watchman, who was joined by Policeman Densmore, to whom Rude pointed out the defendant and related what had occurred. Appellant ran into the hallway and started up the stairs of the rooming-house. He was closely followed by Policeman Densmore, who was dressed in his regulation blue uniform, with the regular police cap, and wearing his badge. The policeman overhauled the defendant on the stairway leading to the second floor, and Densmore asked him where the milk was. Defendant produced the two bottles of milk and handed them to the policeman, who seized hold of the defendant's overcoat and said, "Come and go with me." The defendant said he would go if first taken to his room for the purpose of getting some money he had there. At first Policeman Densmore refused this request and a struggle ensued, during which the defendant was thrown to the floor, and during which he kicked the special officer. Officer Densmore then used his "sap" on the defendant, striking him on the head. Densmore then consented to the defendant getting his money, and the three went into the room occupied by him, which was dimly lighted by a weak electric light. Defendant walked to a dresser, pulled the drawer open a few inches, took from it an automatic pistol, and, throwing it quickly around, shot Policeman Densmore through the heart. Almost simultaneously with the shot the policeman struck the defendant on the head with his "sap," attempted to draw his own revolver, suddenly relaxed and fell to the floor. There was a further struggle between the defendant and Rude in an attempt to get the policeman's revolver, which had fallen to the floor. Rude got the gun and, pointing it at the defendant, snapped it twice, but it failed to explode the cartridge. Rude then ran out of the room, returning a few minutes later with assistance summoned from

the police station. The defendant had disappeared. Policeman Densmore was lying dead on the floor. The automatic pistol was found under some clothes near the dresser. Some hours later the defendant was arrested when he emerged from the river-bed in the Santa Fe railroad yards and asked a switchman how long it would be before he could get a train to Pomona. He said his name was "Fred Edwards." He was carrying an overcoat that was bloodstained. When a policeman raised the defendant's hat there was a clot of blood on his forehead from which blood had run down his face. When asked to account for the blood on the coat and on his face he said he had just arrived in town and had been in a fight with two colored men, one of whom had struck him on the head. He was taken to the scene of the shooting, where he was identified by the landlady as a man who had rented a room from her nearly two months previously, and who registered as "Fred Edwards of Portland, Oregon." The defendant made conflicting statements to the police officers on the day of his arrest. He first denied having an automatic gun, and then said he had bought it in a pawnshop in Los Angeles three weeks previously. Later, he said he had bought it in a pawnshop in Fresno some eight weeks before. In the midst of these conflicting statements there is the admission of appellant that he knew that the policeman he shot was going to take him to the police station for stealing milk, and that he shot the officer because he did not want to be arrested.

There is no material conflict as to any of the foregoing facts. There is a substantial variance in the evidence as to the manner in which the defendant received certain injuries to his head during the events connected with the shooting and as to the nature of the wounds. The defendant testified that the bumps and cuts on his head were inflicted by Officer Densmore beating him during the scuffle that has been mentioned, some of them having been inflicted while the appellant was lying on the floor; that his skull was fractured and his head split open by the blows from the policeman's "sap"; that after being struck he was "bleeding and dizzy . . . like I was drunk, didn't know anything"; that he was again struck by the officer as he opened the drawer of the dresser to reach for his money; that he turned around and saw the officer [Densmore] reaching for his gun; that

he thought it was the intention of Officer Densmore to kill him, and that he thereupon killed the officer before he himself would be killed. The police nurse at the receiving hospital, immediately after the arrest, treated the defendant for injuries consisting of abrasions and swellings on his head. According to his testimony, there was no fracture of the skull and no evidence of any. There was no congestion of the brain, and the injuries were slight flesh wounds which could have been caused by the appellant falling against some object. The witness Rude testified that during the struggle in the hallway Densmore tapped the defendant lightly on the head with the "sap." As to what occurred in the bedroom he could not say whether the policeman struck the defendant before or after the shot was fired. "It was so close together, but he [appellant] wasn't struck until after he brought the gun out of the dresser drawer. . . . He brought it out very quick. . . . The shot was fired as soon as the gun came out, and the officer struck at the same time." The autopsy surgeon testified that the bullet that killed Officer Densmore penetrated the heart, and that such wounds usually cause instantaneous death; that a man of the type of Policeman Densmore, receiving a wound of such a nature, would have sufficient muscular power to voluntarily raise his arm after receiving the wound, and that there are plenty of instances where a gunshot wound through the heart did not result in immediate death, and men have run short distances, raised their arms, and even fired guns after receiving such wounds.

[1] The defendant requested the following instruction: "You are instructed that even though the defendant was subject to arrest by the officer he nevertheless had a right to protect himself from any unwarranted attack if any made upon him by the officer, and if the officer suddenly hit the defendant with a blackjack, the defendant had a right to take any course necessary to protect his own life or to defend himself from great bodily injury." The instruction was modified and given as follows: "Even though the defendant was subject to arrest by the officer he nevertheless had a right to protect himself from any unwarranted attack if any made upon him by the officer." Appellant complains that the action of the court so devitalized and emasculated his requested instruction as to render it of no assistance to his

case. The court did instruct the jury, however, at the request of the defendant, that every person has a right to resist an unlawful attack upon his person, whether that unlawful attack is made by a private citizen or a police officer, and that the degree of force he may use in resisting such an attack is governed by the force and danger of the attack, and that one unlawfully attacked in such manner as to reasonably appear to endanger his life or limb may resist, even to taking the life of his assailant; and, further, that if the jury believed that Policeman Densmore was making an unlawful attack upon the defendant, and that the attack was such as to make it then appear to a reasonable person placed in the position of the defendant that he was in immediate and imminent danger of losing his life or receiving great bodily harm, or if the jury had a reasonable doubt whether or not such a condition then confronted the defendant, it should give him the benefit of the doubt and return a verdict of not guilty. The jury was also instructed that in determining whether a man exercises his right of necessary self-defense, he must be understood to act on the facts as they appear to him as a reasonable person, and that if without fault or carelessness he is misled concerning them and defends himself correctly according to what he in good faith supposes the facts to be, his action is justifiable though the facts are in truth otherwise, and he really has no occasion for the extreme measure. It therefore appears that no harm was done to the defendant by the modification of the requested instruction.

[2] In view of all the instructions given, the court did not err in instructing the jury that if from the evidence it believed "beyond all reasonable doubt, that, without any overt act or physical demonstration upon the part of the deceased sufficient to warrant the defendant, as a reasonable man, in believing that he was in great bodily danger, he, the defendant, fired the fatal shot at deceased and killed him, such killing under such circumstances was not justifiable."

[3] Appellant next complains that the court erred in refusing to give two instructions requested by him relating to the presumption of innocence that goes with the defendant through the trial of the case. The court, however, did instruct the jury that the defendant in a criminal action is

presumed to be innocent until he is proved to be guilty, and that in case of a reasonable doubt whether his guilt is satisfactorily shown he is entitled to an acquittal. Explicit instructions defining reasonable doubt and stating that the burden of proof is upon the prosecution were also given. While the instructions given do not repeat and elaborate upon the subject as fully or as comprehensively as those requested by the appellant, they concisely cover the points stated, and were sufficient. (*People* v. *Miles,* 143 Cal. 636, 640 [77 Pac. 666].)

[4] The jury were instructed that "the flight of a person immediately after the commission of a crime, or after the crime has been committed with which he is charged, is a circumstance to be weighed by the jury as tending in some degree to prove a consciousness of guilt, and is entitled to more or less weight according to the circumstances of the particular case. Evidence of flight is received, not as a part of the *res gestae* of the criminal act itself, but as indicative of a guilty mind; and if you believe from the evidence in this case that the defendant fled from the scene of the offense alleged to have been committed, that is from the room and house in which the deceased Densmore was it is a circumstance to be weighed by you as tending in some degree to prove a consciousness of guilt. It is not sufficient of itself to establish the guilt of the defendant, but the weight to which that circumstance is entitled is a matter for you to determine in connection with all the other facts and circumstances called out in this case." This instruction omits the qualification that the defendant, at the time of his flight, knew he was charged with the murder of the police officer, and the giving of such an instruction without the qualification of knowledge on the part of the defendant has for a long time been discountenanced by this court (*People* v. *Jones,* 160 Cal. 358, 369 [117 Pac. 176]; *People* v. *Sainz,* 162 Cal. 242, 246 [121 Pac. 922]; *People* v. *Lee Nam Chin,* 166 Cal. 570 [137 Pac. 917]); but, as was said in the latter case (p. 573), "we will not reverse a case solely because such an instruction has been given, unless it appears that the defendant has been prejudiced thereby." No such prejudice appears in this case.

[5] At the request of the people the jury was instructed that if in this case they should find the defendant guilty

of murder in the first degree, and they also should find the further fact that there was some extenuating fact or circumstance in the case, it was within their discretion to pronounce such a sentence as would relieve him from the extreme penalty of the law.  Continuing, the court said: "The Penal Code invests a jury in a criminal case for murder with the discretion, but the discretion is not an arbitrary one, and is limited to determining which of two punishments shall be inflicted, and is to be employed only when the jury is satisfied that the lighter penalty should be imposed.  If the evidence shows beyond all reasonable doubt the defendant to be guilty of murder in the first degree, but does not show some extenuating fact or circumstance, it is the duty of the jury to find a simple verdict of murder in the first degree, and leave with the law the responsibility of affixing the punishment."  Appellant asserts that this instruction is erroneous in that it took away from the jury the right to exercise the discretion vested in it by section 190 of the Penal Code, which, in so far as is material here, provides that "every person guilty of murder in the first degree shall suffer death, or confinement in the state prison for life, at the discretion of the jury trying the same."  Appellant's contention is that by giving the instruction the court interfered with the jury's discretion and in effect told the jury they must find mitigating facts or extenuating circumstances in the case; otherwise the death penalty should be inflicted.  Instructions identical with the one given in this case, or so similar as to be the same in effect, have been considered by this court in a number of cases which are reviewed in *People* v. *Rogers*, 163 Cal. 476 [126 Pac. 143].  In that case the court said (p. 484): "The law of this state thus appears to be thoroughly settled to the effect that the instruction in question is not erroneous."  Furthermore, it appears from the record that after the jury retired to deliberate upon its verdict, it came into court and requested a further instruction as to the penalty to follow if in its opinion the evidence proved the crime of murder in the first degree.  The trial court thereupon fully and at length explained the discretion resting with it in fixing the penalty at either life imprisonment or a judgment of death, and the manner in which the exercise of such discretion should be evidenced.  The right

of the jury to exercise the discretion vested in it by the code section was therefore not invaded by the trial court.

[6] Appellant complains that the court erred in refusing to give certain instructions to the effect that mere probabilities are not sufficient to warrant a conviction, nor is it sufficient, upon the doctrine of chances, that it is more probable that the defendant is guilty, and also that the defendant was not compelled to prove himself innocent. In its instructions concerning the presumption of innocence that attends a defendant in a criminal action, and in its definition and explanation of the term "reasonable doubt," and in explaining where lies the burden of proof, the trial court repeated in almost exact words parts of the requested instructions, and gave all of them in effect. [7] Trial courts are not required to repeat over and over again instructions couched in varying language but embodying the same principle of law. (*People* v. *Bickerstaff*, 46 Cal. App. 764, 775 [190 Pac. 656], opinion of the supreme court denying petition for hearing after judgment in the district court of appeal.)

[8] Appellant contends that the court erred in refusing to give a number of instructions requested by him relating to the authority of Policeman Densmore to arrest the defendant, and under what circumstances arrests are illegal. The court did, however, embody in its charge the substance of the sections of the Penal Code relating to arrests, and by whom and how made. The ruling of the trial court refusing to give the requested instructions was correct. Assuming, without deciding, that the policeman may not have had actual authority, as defined by the code, to arrest the defendant without a warrant (Pen. Code, sec. 836), the night watchman, Rude, specially employed to watch the premises from which the milk was stolen, did have such authority, either as a special police officer—provided he was one—or as a private citizen, for the public offense was one committed in his presence. (Pen. Code, sec. 837.) Rude also had authority to summon the policeman to aid him in apprehending the defendant, if he deemed it necessary; and it was not necessary to inform the defendant of the intention to arrest him, for he was pursued and apprehended immediately after the commission of the offense. (Pen. Code, secs. 839, 841.) [9] For another, and perhaps more cogent, reason the ruling of the trial court was correct.

Whether or not either Watchman Rude or the decedent Densmore had authority to arrest the defendant in the first instance became an unimportant question and an immaterial consideration in the light of subsequent events. By the defendant's own admission he was actually apprehended and placed under arrest on the stairway of the lodging-house. On the demand of the policeman he produced the bottles of milk he had stolen. Policeman Densmore thereupon said to him: "Consider yourself under arrest. You have to come along with me." The defendant replied: "Please let me go in my room and get my money first, and then I go along with you." The policeman at first refused to accede to defendant's request, but finally agreed to take him to the room. When there, the defendant testified Densmore made an unprovoked assault upon him, and he feared he was about to be killed. He thereupon shot the policeman to save himself. By his own testimony the defendant narrowed the issues to one of self-defense against an alleged unwarranted assault, and entirely eliminated any issue or contention that he shot the policeman while resisting an illegal arrest. He committed the act after being arrested, and while in actual custody of the policeman. In justification of his act he relied upon a plea of self-defense against personal injury or death, and the jury was fully instructed as to his rights in that theory of the case. The requested instructions would have interjected a false quantity into the case and would have been confusing to the jury.

Appellant also urges that the court erred in refusing to give certain instructions to the effect that if the jury found the homicide complained of was committed by defendant upon a sudden quarrel or heat of passion, the offense was but manslaughter, and the defendant could not be convicted of any higher crime. In an instruction, given by the court, it read section 192 of the Penal Code, defining manslaughter to be the unlawful killing of a human being without malice, and to be of two kinds, one of which is voluntary—upon a sudden quarrel or heat of passion. It also instructed the jury that intention to kill "must be formed upon a pre-existing reflection and not upon a sudden heat of passion sufficient to preclude the idea of deliberation."

The trial court, in its charge to the jury, taken as a whole, correctly and comprehensively instructed the jury upon all

the principles of law applicable to this particular case. It was not required to do more.

The judgment and the order of the trial court denying the defendant's motion for a new trial are, and each is, affirmed.

Myers, J., Lennon, J., Lawlor, J., Kerrigan, J., and Seawell, J., concurred.

Rehearing denied.

All the Justices concurred.