[Crim. No. 887.   Third Appellate District.—August 4, 1926.]

# THE PEOPLE, Respondent, v. DAVID S. WILL et al., Appellants.

[1] CRIMINAL LAW—MURDER — DEGREE OF CRIME — EVIDENCE.—In this prosecution for murder, growing out of the killing of the deceased in an attempt to eject him from his home and get possession of certain mining property, the evidence was amply sufficient to support a verdict of murder of the first degree.

[2] ID.—INTENT TO RESORT TO VIOLENCE—BELIEF OF DECEDENT—SELF-DEFENSE — USE OF DEADLY WEAPONS. — Where the decedent, after being informed that defendants desired to serve a notice upon him, peaceably permitted one of the defendants to make such service, the defendants had then accomplished everything they could lawfully do toward gaining possession of the premises; and in view of the armed condition of defendants and their previous threats, where one of the defendants succeeded in reaching the porch of decedent's house and engaged in a violent struggle with the latter, he had every reason to believe that defendants intended, as in fact they did intend, to resort to whatever violence might be necessary to eject him from his home, and under such circumstances decedent was justified in resorting to the use of a deadly weapon in self-defense.

[3] ID. — INTERFERENCE BY CODEFENDANT — JOINT RESPONSIBILITY. — Where one of the defendants manifestly intended and endeavored and actually did enter the cabin of decedent in a violent manner for the purpose of forcibly ejecting decedent therefrom, and his codefendant knew that he had wrongfully and unlawfully engaged in a violent struggle with decedent, the act of said codefendant in interfering in the difficulty placed both defendants in the same position.

[4] ID.—VOLUNTARY STATEMENTS—EVIDENCE.—In this prosecution for murder, the record did not sustain the contention of defendants that their several statements to the police officers "were not voluntary and were made through fear, intimidation, duress and by promise of leniency on the part of the officers"; and where said defendants voluntarily testified to substantially the same facts at the coroner's inquest and they introduced in evidence at the trial their testimony so given, no prejudice to their

---

2. Homicide in defense of habitation, see note in 25 **A. L. R.** 508. See, also, 13 **Cal. Jur.** 651.

3. Right to take life in defense of another, see notes in 13 **Ann. Cas.** 1130; 45 **L. R. A.** 703; 39 **L. R. A. (N. S.)** 671; 45 **L. R. A. (N. S.)** 145. See, also, 13 **R. C. L.** 838.

substantial rights could have resulted from the admission of such statements to the police officers.

[5] ID. — KEEPING OF FIREARM — VIOLATION OF LAW BY DECEDENT — EVIDENCE.—In such prosecution, conceding the trial court erred in sustaining the prosecution's objection to conversations between decedent and the sheriff, on a prior occasion when the latter had placed the former under arrest, and wherein the decedent was informed that it would be a felony for him to have any weapon in his possession or custody, the defendants did not suffer any prejudice therefrom, where the court in effect told the jury that it is presumed that decedent knew he was violating the law by keeping firearms, he theretofore having been convicted of a felony, and it was an admitted fact that decedent did have firearms at the time of the homicide.

[6] ID.—INTENT TO COMMIT CRIME — TIME — JOINT ACTORS — AIDING AND ABETTING — INSTRUCTIONS. — In such prosecution, the court's instruction that whoever aids and abets in the commission of a murder is himself guilty of murder, whether or not the fatal shot was fired by him, whether or not he went to the scene of the crime with the purpose of committing murder, and whether or not he went there "to aid or encourage the perpetrator or to lend assistance in case such assistance becomes necessary," in effect told the jury that the intention to commit murder or to aid and abet in the commission thereof may be formed at the scene of the crime, even though the defendant may have gone there without any such intention, and this is the law; but where the defendants were both firing simultaneously and continued so to fire until decedent dropped, both defendants were principals, and the rule as to aiding and abetting had but a limited application.

[7] ID.—DEFENDANTS AS WITNESSES—INSTRUCTIONS—ERROR WITHOUT PREJUDICE.—In such prosecution, while it was error to instruct the jury that "the defendants are competent witnesses in this case, and you must consider their testimony in arriving at your verdict; but in determining what weight and credibility you will give to their testimony in making up your verdict, you may take into consideration as affecting their credibility, their interest in the result of the case, and that they are accused parties on the trial testifying in their own behalf," the evidence of guilt was so strong and convincing that it could not be held that there had been a miscarriage of justice.

[8] ID.—ACT AND INTENT—INSTRUCTIONS.—In such prosecution, the error in omitting from the instruction that "there need be no

6. See 13 Cal. Jur. 598.
7. See 8 Cal. Jur. 357, 358.

appreciable space of time between the intention to· kill and the actual killing. . . . It is only necessary that the act of killing be preceded by (and the result of) a concurrence of will, deliberation, and premeditation on the part of the slayer," the words, "and the result of," was cured by the following instruction that "the intent to kill must be the result of deliberate premeditation. It must be formed upon a pre-existing reflection."

[9] ID.—SELF-DEFENSE—PROVOKED QUARREL—EVIDENCE—INSTRUCTIONS. In such prosecution, the evidence having shown that the fault of the defendants was neither remote nor trifling, but of a grievous character, well calculated to produce in decedent's mind a well-founded belief that defendants intended to resort to whatever violence might be necessary to accomplish their evident purpose, and the court, in effect, having instructed the jury that a person who arms himself with a deadly weapon for the purpose of seeking his adversary and provoking a quarrel with him cannot feloniously use such weapon to take the life of his adversary, and then come into court and claim that he acted in self-defense, but that a party is not deprived of the right to defend his person from a felonious assault because he began the affray, if he afterward, and before the fatal blow was struck, in good faith endeavored to withdraw from the combat, there was no merit in defendants' objection that under the instruction defendants could not have the plea of self-defense, however remote or trifling the fault might be.

[10] ID. — UNLAWFUL ATTEMPT TO EXPEL DECEDENT — RESISTANCE BY FORCE — INSTRUCTIONS. — In such prosecution, while the court's instruction that "if you are convinced to a moral certainty that" the decedent "was in lawful possession of" a certain cabin "as his home, and if you further believe that defendants went to said cabin with the intention of using such force as might be required to expel" decedent, "this was an unlawful act on the part of defendants, and if you further believe that defendants were in the act of so doing, then" decedent "had the right to resist by force," might have been more appropriately framed, it was substantially in accordance with the terms of section 197 of the Penal Code.

[11] ID. — LAWFUL DEFENSE OF HOME OR LIFE — HOMICIDE — INSTRUCTIONS.—It is lawful for one lawfully to defend his person or home and his life cannot lawfully be taken because of his doing so; and in this prosecution for murder, the court properly instructed the jury that "If you believe to a moral certainty and beyond a reasonable doubt, that without any overt act or physical demonstration upon the part of the deceased, save that of lawful defense of his person or home, sufficient to warrant the defendant, as a reasonable man, in believing that

he was in great bodily danger, he, the defendant, fired the fatal shot at the deceased and killed him, such killing under such circumstances was not justifiable."

(1) 30 C. J., p. 312, n. 42. (2) 30 C. J., p. 83, n. 29. (3) 29 C. J., p. 1063, n. 58; 30 C. J., p. 79, n. 74; 30 Cyc., p. 1538, n. 37; 40 Cyc., p. 210, n. 99. (4) 17 C. J., p. 321, n. 47. (5) 16 C. J., p. 960, n. 72, p. 994, n. 35; 17 C. J., p. 338, n. 39 New. (6) 29 C. J., p. 1063, n. 58; 30 C. J., p. 394, n. 5. (7) 16 C. J., p. 1020, n. 41; 17 C. J., p. 368, n. 5. (8) 16 C. J., p. 1053, n. 93. (9) 30 C. J., p. 53, n. 91, p. 374, n. 56. (10) 30 C. J., p. 374, n. 56. (11) 30 C. J., p. 374, n. 56.

APPEAL from judgments of the Superior Court of Placer County and from orders denying new trials. J. B. Landis, Judge. Affirmed.

The facts are stated in the opinion of the court.

K. D. Robinson for Appellants.

U. S. Webb, Attorney-General, and J. Charles Jones, Deputy Attorney-General, for Respondent.

FINCH, P. J.—The defendants were jointly charged with the crime of murder and were jointly tried. Will and Worth were convicted of murder of the first degree and Andrews of manslaughter. Will and Worth have appealed from the judgments and the orders denying their motions for new trials. Andrews did not appeal.

March 11, 1924, Will received a deed to the west half of the southeast quarter and the east half of the southwest quarter of a certain section of land, the first parcel being patented land and the other unpatented. He thereafter resided in a house on the east eighty near the west boundary line thereof. In the year 1922 W. C. King located a mining claim which was partly at least on the west eighty, but a part of which Will contended, after the execution of said deed, was on the east eighty. In April, 1923, King relocated the mining claim with the same boundaries as the original location, and built a cabin on it a short distance west of the boundary line between the two eighties, in which he and his wife thereafter resided until September 8, 1924. King and his wife then departed from the premises, leaving

Thomas W. Carl in possession thereof under an oral agreement to purchase the property from King. There was a dispute as to whether a part of King's mining claim was on Will's patented land. The King cabin was about three hundred feet from the house in which Will resided. In July, 1924, Will posted and recorded a notice of location of a mining claim which, in part at least, overlapped the King claim. Will thereafter served notice on King to vacate the latter's claim and the relations between them became unfriendly. Carl appears to have participated in the controversy between the rival claimants, taking King's side therein. Before the Kings left the premises, Carl and Will engaged in a fist fight and the latter caused the arrest of the former. In the year 1901 Carl was convicted of the crime of manslaughter in Indian Territory and thereafter served a term of imprisonment therefor. The three defendants frequently discussed the matter of dispossessing Carl and they sought the advice of attorneys as to the means to be employed to that end. On January 9, 1925, the attorneys signed and delivered to Will a letter directed to Carl, stating that they were advised by Will that Carl was trespassing on Will's said mining claim, describing it, and notifying him "to immediately refrain from all further trespassing upon said property" and that "David S. Will intends to enter upon said property and perform work and labor thereon, and will hold you personally responsible for all interference therewith, and for any further trespass upon said property." During the evening of that day Will requested Clarence Burner, a deputy sheriff residing at Forest Hill, a few miles from Will's home, to go with him to the King cabin and serve the letter on Carl. Burner stated that he would do so during the forenoon of the following day. Burner thereafter discussed the matter with the sheriff, who advised him that the letter was not from the court and that he "had not the right to go and put him in possession of the property with a paper of that kind." In the meantime Will had made arrangements with the other defendants to go with him and Burner to serve the letter upon Carl. Will testified that he desired to have them along as witnesses. Upon Burner's failure to appear at the appointed time, Will drove to Forest Hill to ascertain the reason for his nonappearance. Burner informed Will of the advice he had received from the sheriff

and declined to serve the letter. Will then "stated that
he had an order from his attorney to take possession and
that he was going to take possession. . . . He said he had
waited five months for a decision and that 'son of a bitch'
had pestered him as long as he was going to let him, and it
was either him or Carl." In one of the conversations with
Burner, Will said that "he was going to have possession of
his property or die in the attempt." Burner testified that
Will said that "either him or Carl would go out of the cabin
feet first, or something to that effect. . . . He said that
Mr. Andrews and Mr. Worth were going with him. . . . I
explained to him I thought it would mean trouble for him
to go there and he said he was not afraid of trouble as they
were all going armed." After Burner refused to go with
him, Will left and in about one and a half or two hours
he returned to Forest Hill and said: "Well, Burner, it
ended bad, I killed him." The uncontradicted evidence
shows that upon Will's return home from Forest Hill Janu-
ary 10th, he armed himself with a 38-caliber revolver, the
barrel of which is seven inches long, and started with the
other defendants to Carl's cabin for the purpose of taking
possession of the property. He inserted the barrel of the
gun inside one of the lace-top boots he was wearing, the
handle being above the top of the boot. Worth was armed
with a 45-caliber automatic pistol, which he habitually car-
ried. Andrews carried an ax and a saw. As they ap-
proached Carl's cabin an altercation between Carl and Will
took place, which terminated in the death of Carl from
gunshot wounds inflicted by Will and Worth, each of them
firing six shots. A witness for the prosecution testified that,
a few hours after the homicide, Will said that as the de-
fendants approached the cabin Carl "leveled a rifle on
them" and said he would kill them if they "took another
step"; that Will then informed Carl that Worth had a letter
to read to him; that Carl set the gun down, but held it in
one hand, while Worth walked up to the cabin and read the
letter and handed it to Carl; that Will then walked up to
the porch on which Carl was standing, waving his (Will's)
hands and saying not to have any trouble; that when Will
got on top of the porch "he made one leap and grabbed him
and they had a scuffle . . . and in the tussle the rifle dropped
out of Carl's hand and wrestled until they got over to the

stove and the stove was knocked over. . . . Then he said
they let go and kind of peaceable . . . and he said after
talking a little bit Carl made a move and he naturally thought
he was reaching for his gun, . . . back towards the little
partition with a curtain. . . . He (Will) was sitting on a
chair by the table, and when he saw Carl reach what he
thought for a gun, he reached for his gun, he said he had it in
his . . . high-topped boots and had it in loose purposely to get
his gun and he, while he reached for that gun Mr. Carl had
shot the first shot; that he pulled out his gun and shot,—while
firing one of his shots he heard Mr: Carl groan, . . . and he
knew he had hit him, and . . . Mr. Will said he stood up and
kept shooting.''   January 12, 1925, Will made a statement in
the sheriff's office, which was taken down by a stenographer
and was admitted in evidence at the trial.   In this statement
Will said that, after his return home from his second trip
to Forest Hill, ''I was afraid that I might say something
that would aggravate Carl, so I asked Mr. Worth to read
the letter to him. . . . I walked over there from my house.
It is only possibly 300 feet across. . . . Mr. Andrews took
a saw and an ax.   Mr. Worth read the letter for me to take
possession and start doing work, and I said we would cut a
tree down and block the road (leading to the King cabin)
after he took his stuff out. . . . When Mr. Worth went
ahead to read the letter, but Carl stopped Andrews and me
on the bridge with a rifle, . . . maybe 25 or 30 feet (from
Carl's cabin), something like that. . . . Carl said, 'You son
of a bitch, your claim is up, and if you come on my property
I'll kill you.' . . . He held it (the rifle) up ready to shoot,
but he didn't point it towards me, but not even with his
shoulder as a man naturally would if he took quick action.
. . . He was coming from the wood pile when he saw me
leave the house with the other two men behind me, and he
ran into the house and got his rifle which was standing
inside the door. . . . We were all pretty near together. . . .
Worth said, 'I have a letter of importance to you, Carl,
and you can in no way hold anything against me, Carl.   I
want to read this letter, and you may change your mind.'
He talked very sensible. . . . After he read the letter Carl
took it and read it himself. . . . And when he read the
letter he set the rifle just inside the jamb of the porch. . . .
I was still standing about 20 feet away, I expect. . . . He

said (quoting some vulgar and abusive epithets relative to
the defendants and their attorneys), but I kind of thought
this fellow was putting it on for a bluff. . . . We stood
there, and Mr. Andrews got away from me; he expected to
get shot. . . . After he kind of got over his spasm of anger,
I argued the matter with him. I said, 'Carl, look here,' and
every time I spoke I would take a step ahead, and I would
keep saying to him, 'Carl, I am determined to take my prop-
erty; I am going to take it,' and I told him that if there
was any court dispute, it could be threshed out in court;
that he was a damned fool and so was I if we did anything
that we would be sorry for. I said, 'nevertheless I must
have my property. I got instructions to take possession of
it, and I sure will'; and it kind of impressed the fellow;
and every time I would say something of that kind I would
get a step ahead, and then he would reach for his rifle set
behind the jamb. . . . I was possibly 15 or 20 minutes
getting up on the porch. . . . I told them (Worth and
Andrews, at the time defendants started to Carl's cabin) to
take possession and start work just as quick as they were
on the property so we would have legal possession. . . . I
told them that after Carl had his things out we would take
the door off and then it would not be a habitable place.
. . . I wanted to cut timber to block that road that they
had in two years and about three or four months. . . . Well,
I edged up to the porch; I finally got to just in front of the
porch, and something attracted Carl's attention, and he looked
the other way, and when he looked I must have jumped one
foot on the porch or top step, and I had Carl clinched, and
in the clinch he must have tried to get the rifle; he moved,
. . . and when I clinched him, of course, he put up a fight
as best he could, but I don't know, but in the clinch I heard
the stove go down, and I swung him around and he went
under the table, and I held him, and I says, 'Now I am in
this house and got possession'; and I never struck the man
at all; I just clinched him, and then I held him with a clinch
so he could not strike me; and there was two knives on the
table, . . . and he had one hand a little free, and I saw
he was trying to get one of those knives; . . . and I took
those two knives and threw them out of the door. . . . He
seemed to cool down and I released him and he talked sensible.
. . . I says, 'if you want to be good I will let you go,' and he

says, 'I am going to stay here,' and I said, 'I don't care if
you stay, but I am going to hold possession.' . . . I thought
it was all over with, but he was a cunning rat, because when
I released him, you saw that curtain, he jumped back of
that curtain, . . . and I hesitated to jump into him again.
I am a very active man, and I hesitated.  I sat down in that
chair near the table that you saw there, . . . and I says to
him, 'Mr. Carl, we don't want any trouble, I don't want any
trouble with you at all. . . . Let's be sensible; let's don't
do anything that will get either of us into trouble, you
can't kill me, and I don't want to kill you; I am armed,
and here is my gun in my boot.' . . . And I says, 'If you
shoot me and don't get me vital, I sure will get 'you'; and
then there was a pause, and he says, 'You son of a bitch, get
out of here yourself; you will have to get out of here or I
will kill you.'  I thought of an argument, but I went there
to get possession, and Mr. Carl made a grab, I don't know
where he got it, I didn't see all of his grab, it was behind
the curtain, the curtain was· between me and him.  I was
sitting, but just as soon as I saw the gun the flash was there,
and when the flash came I felt a sting, but it did not break
the skin, it just made a brown streak. . . . By the time he
was to the curtain part of him got in view there, and it
was over quick. . . . Everything was so quick I can't go
into details. . . . The reason why he didn't get me, my first
shot got him. . . . I got him the first shot, because he went
'Oh.' . . . When I came to myself, he had went down, and
I was still pulling my trigger, and I saw that he had stopped
shooting. . . . I know he shot three or four times, but I can't
say if any more. . . . I had made up my mind that as long
as I could move, that was my direct determination, I don't
want to cover up anything on my side, I was going to take
possession. . . . It seems to me there was something said
after he came out with the gun, I wouldn't say positively,
but I may have stopped him from using it.  Maybe I had
my gun when he got back.  I never reached for my gun until
after I see a move of him trying to get his gun anyway. . . .
I used to be an awful good shot, and, as I told you, I knew
three of my shots had taken effect.''  Will was a witness
at the coroner's inquest upon the body of Carl and at the
trial and, while his testimony there given differed in some
particulars from his foregoing statement, in the main and

most important parts it was substantially the same. At the coroner's inquest he testified that after the homicide, "I told them (Worth and Andrews) not to go in the house or have anything to do with the body, but I wanted them to hold possession of the property in general. . . . We had talked the matter over before, and we agreed that if we got possession, we would cut down trees. . . . I told the boys that we would cut down some trees and take the door and windows out of the building. That would be taking possession. That house would be uninhabitable with the door and windows off." Immediately after the homicide Worth and Andrews removed the door and window-sash from the cabin, felled a tree to block the road leading to the cabin, and later built a fence across the road.

While Worth, according to his own testimony, fired six shots, one of which probably was the immediate cause of Carl's death, he did not surrender himself to any peace officer, but hid his gun in the brush and for a time denied that he had taken any part in the homicide and stated that he was not armed at the time and that he did not even own a gun. On the day after the homicide, in answer to a question whether there was any scuffle or loud talk between Will and Carl outside of the cabin, Worth said: "Oh, yes, there seemed to be a lot. I don't recall the words. Of course, neither one of them did not take kindly to each other, and all threatening. . . . Carl said: 'I am going to shoot you.' . . . That must have been about the time I was reading the letter. . . . He (Will) must have been . . . in front of the cabin. . . . We (later) heard a scuffling in the house. . . . We (Worth and Andrews) went upon the porch —up to the door. . . . It seems that just before the firing— I remember seeing that long pistol. . . . He (Carl) had that long pistol like a man standing like here, he was all ready to fire, and we crawled up there to the door, and perhaps in a second or two he fired; as I remember he said he would kill the whole bunch, . . . and fired and kept on firing . . . (at) Will. . . . (After the shooting was over) Mr. Will . . . came to the door . . ..and said, 'Boys, he sure got me.' " On the following day Worth made a statement in the presence of the other defendants, in which he again denied that he had any part in the shooting of Carl. January 13th Worth made another statement in the presence of the

other defendants, his statements made on both days being taken down by a shorthand reporter. In the latter statement Worth said: ''Well, as I told you men yesterday, perhaps I have been unduly—allowed myself to be unduly led into this. Of course, when I am a friend of anyone, I am a friend. . . . Where I was born and raised, you see you can't stand a threat. I can't, . . . I will not take it. Anyway, I told you I would not kill anyone, I don't think I really killed him. . . . I was to block the road, the idea was, as I understood it. That was property absolutely belonging to Mr. Will and I believed I was doing right in going over there to fall these trees, and I would say to fall that tree and block that road. . . . Mr. Will: (To Worth) Tell the truth, as you remember. Mr. Worth: . . . The tree was cut after the fight, . . . and the door and window was taken out after the arrival of the officer. We went there to take possession; we were under orders to take possession. . . . I . . . believed that Thomas Carl was a man of dangerous temper, a man of vicious temper, hotheaded, threatening, had a bunch of guns and made a show of his guns and the way he could use them by throwing up cans, shooting at targets, and showing how quick he could draw pistols into action, what you would call a gun man. . . . I grew up with a gun in a gun country. I seen several men where they had been killed, and knew many cases, common cases, and knew men that died by the gun and knew about as much about a gun or gunmen, and that was a common occurrence, and lots of gun practice in the way of doing trick shooting, quick draw stuff, and this kind of thing; and my experience was such that I never placed confidence in a man that did that, and therefore I say that I could not have feared Thomas Carl. I believe he was a man of character' cruel and vicious, and would not hesitate to kill. . . . I realized I was more or less in jeopardy myself and placing myself in a dangerous position. . . . It was common for me to carry the gun. . . . I was waiting for legal advice before I made any reference to my possession of this Colt army automatic pistol. . . . The idea was Mr. Will was going over and take possession, and the proposition was Mr. Carl had no right there, owned no property there, except movable, and he was to load up his car and get out of there. Q. Did you discuss what would happen if

Carl did not go? A. In this much. We all had confidence that he would not attempt any shooting when there was three of us. . . . We said he surely won't be foolish enough to shoot. . . . Q. When you heard the stove go over, you were about to go up on the porch? A. Yes, I was just stepping up. . . . I stepped up on the porch, and stepped in the door, and . . . grabbed that rifle and set it outside of the door. . . . I hardly know just for a few seconds of time there what I did do, but I remember seeing Mr. Will sitting in a chair and Mr. Carl standing in what would be the opening of the curtains . . . with what looked to be a very large pistol in his hands, and that I did then hear, immediately after, . . . those words, 'I will kill the bunch,' and about immediately at that he raised what afterwards proved to be a Luger pistol and commenced firing at Mr. Will. . . . I heard Mr. Will say, 'He has shot me,' or 'He has got me.' I immediately drew my Colt automatic pistol and began firing. . . . I advanced to the stove and must have drawn while I was advancing. . . . My impression was that, as he started to raise that pistol he would sweep Mr. Will and sweep us. . . . I had the pistol in both hands. I shoot that way. . . . Q. Did those two curtains interfere at any time with your view? A. I don't think it did. . . . Carl was in my full view. I was following him. The stove was here (showing) and I was following him seeing he could not get away. I was following that Luger pistol. I remember as my last shot sounded his head dropped over and his hand left the pistol." Worth was a voluntary witness at the coroner's inquest and the testimony which he there gave was introduced at the trial by the defendants. While such testimony in the main is in accordance with Worth's foregoing statement, it differs therefrom in some particulars. At the inquest he testified that, after reading the letter to Carl, "I stepped back . . . about five or six feet. . . . He (Will) went up the steps and onto the porch, and . . . he put out his hand and says, 'Let's shake hands; let's be men about it; let's not quarrel.' . . . In a few moments then they disappeared inside the house, . . . Directly after they disappeared there was a rumble and clatter, and I went up onto the porch. . . . I was semi-conscious, gentlemen, that that peculiar movement behind the door jamb meant something. . . . I took that rifle and set it on the outside of

the house. . . . The commotion seemed to have subsided. . . .
Then I . . . looked in. . . . Mr. Will was sitting in a chair,
and Carl was standing in like a partition of curtains. . . .
I see a long barrel; I took it for granted it was a pistol.
. . . He (Carl) raised that gun and commenced firing; it
seems he kept on firing. . . . Which way I moved I don't
know, but I must have . . . pulled the pistol—one, two,
three, four, five, six . . . I fired six shots. . . . The (Carl's)
hand released the pistol. . . . His head dropped over. . . .
I figured that the battle was over. . . . I had only one pur-
pose and that was to stop that Luger pistol. . . . My im-
pression was that Mr. Will was being killed. . . . Mr. An-
drews and myself, after Mr. Will started (to Forest Hill
to surrender to Bruner), we cut down this tree, and we
took the door off the hinges and took the window out, took
the sash out.''

[1] The statements and testimony of the appellants are
amply sufficient to support a verdict of murder of the first
degree. Indeed, it would be difficult to find a basis in the
evidence for any other verdict. Carl was, and for several
months prior to the homicide had been, in possession of the
cabin and the land on which it stood as his home, and his
predecessor, King, had been in continuous possession of the
premises for more than two years immediately before Carl
went into possession. It is clear that the defendants had
agreed among themselves that they would forcibly and un-
lawfully eject Carl from the premises. The appellants,
knowing of the strained relations between Will and Carl
and that the latter was a dangerous ''gun man,'' and that
he would probably resist to the uttermost, instead of en-
deavoring to gain possession by the orderly processes of the
law, deliberately armed themselves with deadly weapons,
that of Will at least being plainly visible to Carl, and de-
cided to take the law into their own hands, hoping that
Carl would be overawed by the number of his antagonists,
but determined to take possession of his home at all hazards.
[2] Carl warned them not to approach the cabin, but,
when informed that they desired to serve the letter, or
notice, upon him, he peaceably permitted Worth to make
the service. The defendants had then accomplished every-
thing that they could lawfully do toward gaining possession
of the premises, but, notwithstanding this fact, Will suc-

ceeded in reaching the porch and engaged in a violent struggle with Carl. Carl had every reason to believe that the defendants intended, as in fact they did intend, to resort to whatever violence might be necessary to eject him from his home. As Carl seized a pistol to defend himself and his home, Will drew his own revolver, instead of withdrawing from the conflict which he had deliberately provoked. Under such circumstances Carl was justified in resorting to the use of the deadly weapon in self-defense. "Homicide is justifiable when committed by any person . . . against one who manifestly intends and endeavors, in a violent, riotous or tumultuous manner, to enter the habitation of another for the purpose of offering violence to any person therein." (Pen. Code, sec. 197.) **[3]** There can be no doubt that Will manifestly intended and endeavored and actually did enter the cabin in a violent manner for the purpose of forcibly ejecting Carl therefrom. "Violence is synonymous with physical force, and the two are used interchangeably, in relation to assaults, by elementary writers on criminal law." (Bouvier's Law Dictionary. See, also, *Knowles* v. *Crocker Estate Co.,* 149 Cal. 278, 284 [86 Pac. 715].) Worth is in no better position than Will. He knew that Will had wrongfully and unlawfully engaged in a violent struggle with Carl. "A person interfering in a difficulty in behalf of another simply steps in the latter's shoes; he may lawfully do in another's defense what such other might lawfully do in his own defense but no more; . . . and his act must receive the same construction as the act of the person defended would receive if the homicide had been committed by him." (30 C. J. 79; *People* v. *Travis,* 56 Cal. 251, 256.)

**[4]** Appellants contend that their foregoing statements "were not voluntary and were made through fear, intimidation, duress and by promise of leniency on the part of the officers," but the record in no manner sustains the contention, besides, the appellants voluntarily testified to substantially the same facts at the coroner's inquest and they introduced in evidence at the trial their testimony so given and, therefore, no prejudice to their substantial rights could have resulted from the admission of such statements.

**[5]** The sheriff of the county was called as a witness by the defendants and examined as follows: "Q. Along in

September, 1924, did you have occasion to arrest one T. W. Carl? A. I did. Q. At that time did you take any weapon from him? A. At the time of his arrest he delivered a gun to me. Q. And after the preliminary examination did you return that gun? A. I did not. Q. Why? Mr. Lowell: Object to that as incompetent, irrelevant and immaterial. Mr. K. D. Robinson (attorney for defendants): This is the purpose. . . . It is leading up to a conversation with Thomas Carl in which he was advised by the sheriff that it would be a felony for him to have any weapons in his possession or custody. . . . The Court: The objection·will be sustained. . . . Q. . . . Did you have a conversation with T. W. Carl with reference to his possession of firearms? Mr. Lowell: To which we object as incompetent, irrelevant and immaterial and hearsay. The Court: . . . Objection will be sustained. Mr. K. D. Robinson: . . . Wouldn't it go to show he was the aggressor if the deceased knew, procured firearms and knew that when he did so he was committing a felony? The Court: . . . He is presumed to know the law as far as that goes. Would not be necessary to show they were notified or advised by the sheriff.'' These rulings are assigned as error. The court in effect told the jury that it is presumed that Carl knew he was violating the law by keeping firearms, he theretofore having been convicted of a felony. The defendants, therefore, had the benefit of what they were endeavoring to prove. It was undisputed at the trial that Carl did have firearms at the time of the homicide. If it be conceded that the rulings were erroneous, it does not appear that the defendants suffered any prejudice therefrom.

The other errors of which complaint is made relate to the instructions to the jury. The first of these instructions is a copy of one approved in *People* v. *Wolff,* 182 Cal. 728, 739 [190 Pac. 22]. The second is substantially in the language of the instruction approved in *People* v. *Davis,* 135 Cal. 162, 165 [67 Pac. 59]. In addition, the court gave the usual approved instruction upon the question of reasonable doubt. **[6]** The third instruction states in substance that whoever aids and abets in the commission of a murder is himself guilty of murder, whether or not the fatal shot was fired by him, whether or not

he went to the scene of the crime with the purpose of committing murder, and whether or not he went there "to aid or encourage the perpetrator or to lend assistance in case such assistance becomes necessary." The instruction is in effect that the intention to commit murder or to aid and abet in the commission thereof may be formed at the scene of the crime, even though the defendant may have gone there without any such intention. Such undoubtedly is the law. It may be further said that the appellants were both firing simultaneously and continued so to fire until Carl dropped dead. In such a case the rule as to aiding and abetting has but a limited application. Clearly the appellants were both principals. [7] The fourth instruction reads as follows: "The court instructs the jury that the defendants are competent witnesses in this case, and you must consider their testimony in arriving at your verdict; but in determining what weight and credibility you will give to their testimony in making up your verdict, you may take into consideration as affecting their credibility, their interest in the result of the case, and that they are the accused parties on the trial testifying in their own behalf." A similar instruction, though more objectionable, was severely criticised in *People* v. *Maughs,* 149 Cal. 253, 263 [86 Pac. 187, 191], and the court there said: "We think the time has come to say that in all future cases which shall arise, and where, after this warning, this instruction shall be given, this court will hold the giving of it to be so prejudicial to the rights of a defendant, secured to him by our constitution and laws, as to call for the reversal of any judgment which may be rendered against him." In *People* v. *Ryan,* 152 Cal. 364, 369 [92 Pac. 853, 855], which was tried before the decision in the Maughs case, in considering a similar instruction, also more objectionable than the one under consideration here, the court said that "it states to the jury a rule regarding the consideration of the defendant's testimony, which every intelligent man upon the panel would doubtless keep in mind, without being reminded of it by the court, and, aside from the fact that it directs attention particularly to a single witness who is a party to the action, it would be covered by the rule laid down" in previous decisions that a case will not be reversed for the giving or refusing to give an

instruction which states a mere commonplace matter within the general knowledge of jurors. Since the decisions in the Maughs and Ryan cases, section 4½, article VI, of the constitution has been adopted, providing that "no judgment shall be set aside, or new trial granted, in any case, on the ground of misdirection of the jury, . . . unless, after an examination of the entire cause, including the evidence, the court shall be of the opinion that the error complained of has resulted in a miscarriage of justice." While it was error to give the instruction, the evidence against the appellants is so strong and convincing that it cannot be held that there has been a miscarriage of justice. The guilt of appellants is abundantly proved by their own statements, admissions, and testimony. [8] The fifth instruction states that "there need be no appreciable space of time between the intention to kill and the actual killing. . . . It is only necessary that the act of killing be preceded by (and the result of) a concurrence of will, deliberation and premeditation on the part of the slayer." The words in parentheses were omitted from the instruction. An instruction in the same language was condemned in *People* v. *Maughs, supra.* The instruction here complained of, however, was immediately followed by another instruction that "the intent to kill must be the result of deliberate premeditation. It must be formed upon a pre-existing reflection." This cured the error in the instruction complained of because if the intent with which an act is done is the result of premeditation the act itself is the result of premeditation. [9] The sixth instruction is substantially in the language of one which was criticised in *People* v. *O'Brien,* 78 Cal. 41, 46 [20 Pac. 359, 361]. Appellants say: "Under this instruction the defendant could not have the plea of self-defense, however remote or trifling the fault might be, . . . and that if the jury found the defendant guilty of any misconduct, they should 'deny' him the benefit of the plea of self-defense, without regard to the degree or character of his misconduct." The character of the misconduct of a defendant as shown by the evidence must be considered, however, in determining whether such an instruction has resulted in prejudice to the rights of the defendant. In the most favorable view of the evidence, the fault of the appellants was neither remote nor

trifling, but of a grievous character, well calculated to pro-
duce in Carl's mind a well-founded belief that they in-
tended to resort to whatever violence might be necessary to
accomplish their evident purpose. The instructions were
very full and, on the whole, favorable to the appellants,
and, in the language of the court in the O'Brien case,
"taking the different portions of the instruction together,
we think the jury must have understood the court to say
that a person who arms himself with a deadly weapon for
the purpose of seeking his adversary and provoking a
quarrel with him cannot *feloniously* use such weapon to
take the life of his adversary, and then come into court and
claim that he acted in self-defense. The jury were told in
very clear terms that a party is not deprived of the right
to defend his person from a felonious assault because he
began the affray, if he afterward, and before the fatal
blow was struck, in good faith endeavored to withdraw
from the combat. We therefore cannot say that the court
erred." In instructions proposed by the defendants and
given by the court, language to the same effect as that
used in the instruction complained of was employed. One
of such instructions states, "Where one without fault is
placed under circumstances sufficient to excite the fears of
a reasonable person," etc. The seventh instruction is in
the language of one given in *People* v. *Kennett,* 114 Cal.
18, 19 [45 Pac. 994], beginning with the words italicized
by the court in that case and continuing to the end of the
instruction, and of which the court there said "that in and
for itself it contains no error." In *People* v. *Miller,* 125
Cal. 44, 47 [57 Pac. 770], the same instruction was criti-
cised, but it was held that "the giving of the instruction
here does not constitute error." [10] The eighth in-
struction reads: "If you are convinced to a moral cer-
tainty that Thomas Carl was in lawful possession of the
King cabin as his home, and if you further believe that
defendants went to said cabin with the intention of using
such force as might be required to expel Thomas Carl, this
was an unlawful act on the part of defendants, and if you
further believe that defendants were in the act of doing
so, then Thomas Carl had the right to resist by force."
While the instruction might have been more appropriately
framed in the language of section 197 of the Penal Code,

it is substantially in accordance with the terms of that section. As hereinbefore stated, the words "force" and "violence" are synonymous terms when used in relation to assaults. **[11]** The ninth instruction reads: "If you believe to a moral certainty and beyond a reasonable doubt, that without any overt act or physical demonstration upon the part of the deceased, *save that of lawful defense of his person or home,* sufficient to warrant the defendant, as a reasonable man, in believing that he was in great bodily danger, he, the defendant, fired the fatal shot at the deceased and killed him, such killing under such circumstances was not justifiable." An instruction in the same language, excepting the words herein italicized, was approved in *People* v. *Wolfgang,* 192 Cal. 754, 760 [221 Pac. 907]. It is not perceived that the addition of the italicized words renders the instruction erroneous. It certainly is lawful for one lawfully to defend his person or home and his life cannot be lawfully taken because of his doing so.

The court carefully guarded the rights of the defendants throughout the trial and the evidence against the appellants is so clear and convincing that there is no basis for an opinion that the errors complained of have "resulted in a miscarriage of justice."

The judgment and the order are affirmed.

Needham, J., *pro tem.,* and Plummer, J., concurred.